UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
CHEWY, INC.,                         :
                                     :
        Plaintiff,                   :
                                     :        21-cv-1319 (JSR)
        -v-                          :
                                     :        OPINION AND ORDER
                                     :
INTERNATIONAL BUSINESS MACHINES      :
CORPORATION,                         :
        Defendant.                   :
                                     :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

        Now before the court is Chewy's motion to dismiss four of the

five counterclaims of defendant International Business Machine

Corporation ("IBM") for failure to state a claim under Fed. R.

Civ. P. 12(b)(6). ECF No. 32. The patents at issue each claim a

different improvement to web-based technologies.

        After IBM sent Chewy a July 6, 2020 letter alleging that Chewy

infringed four of IBM's patents by operation of its website,

Chewy.com, the parties exchanged letters and competing claim

charts for several months. Chewy then filed the instant action on

February 15, 2021, seeking a declaratory judgment of

noninfringement as to those four patents. On April 19, 2021, IBM

filed its answer along with counterclaims for infringement of those

same four patents. ECF No. 19. Then, on May 24, 2021, IBM filed

its amended answer and added a counterclaim for infringement of a

fifth patent. ECF No. 41. IBM attached twenty-four documents to

1

its amended answer and counterclaims, including the relevant patents, infringement allegations it had sent to Chewy before this case was filed, expert declarations about the inventiveness of each of the claimed patents, and detailed patent infringement contentions. ECF Nos. 41-1—41-24.

Chewy now moves to dismiss four of IBM's infringement counterclaims — as to U.S. Patent Nos. 9,569,414 (the "'414 patent"), 7,076,433 (the "'433 patent"), 6,704,034 (the "'034 patent"), and 7,496,831 (the "'831 patent") — on two grounds. First, Chewy argues that IBM does not plausibly allege infringement of the '414 and '831 patents. Second, Chewy argues that each of the four patent claims are invalid as abstract ideas under 35 U.S.C. § 101. Alternatively, Chewy argues that, if the Court does not dismiss IBM's counterclaim regarding the '443 patent, the litigation as to that patent should be stayed pending the Patent Trial and Appeals Board's <u>inter partes</u> review of the patent. By bottom-line order dated Aug. 4, 2021, the Court denied plaintiffs' motion. ECF No. 61. This Opinion sets forth the reasons for that order.

## BACKGROUND

The patents at issue here claim various improvements to web-based technologies. The claims of each of the four patents — the '414 patent, the '831 patent, the '034 patent, and the '443 patent

2

— are briefly summarized below. For purposes of a motion to dismiss, the Court accepts all well-pleaded factual allegations in the counterclaims as true and draws all inferences in favor of IBM. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

## A. The '414 Patent

The '414 Patent describes a method for obtaining and formatting web content. See ECF No. 41 at ¶¶ 41-43; '414 Patent, ECF No. 41-3 at 9:4-17. Specifically, the '414 patent claims the use of a single HTTP request to obtain separately stored data (JavaScript objects) and formatting instructions (Javascript functions). ECF No. 41 at ¶¶ 41-42. Before the invention of the '414 patent, each combination of data and formatting had to be stored in a separate JavaScript library. Id. at ¶ 36. If developers wanted the same data in a different format, they had to create an entirely new library. Id. Creating, maintaining, storing, finding, and updating these libraries were time-consuming to developers. Id. at ¶ 37. The libraries were a burden on the back-end systems, because the data and formatting had to be stored together and took up a lot of space on a single server. The inventors of the '414 patent addressed these problems by, first, separating the data from the formatting functions. Id. at ¶ 38. Next, the patented approach passes the data (a set of JavaScript objects) as a

parameter to a set of JavaScript functions that provide the
formatting. Id. Finally, the '414 patent requires that this request
for a decoupled set of JavaScript objects and JavaScript functions
be contained in a single HTTP request. Id. at ¶ 42.

IBM alleges that Chewy infringes claims 1–3 and 5 of the '414
patent. ECF No. 41 at ¶ 94. Claim 1, which is representative of
the allegedly infringing claims, recites:

> 1. A method for formatting and serving web content, the method
> performed by a processor comprising:
>> requesting a set of JavaScript objects and a set of
>> JavaScript functions in a single Hypertext Transfer
>> Protocol (HTTP) request; and
>> in response to the requesting:
>> obtaining the set of JavaScript objects that represents
>> dynamic JavaScript data; and
>> obtaining the set of JavaScript functions to format the
>> set of JavaScript objects, the set of JavaScript objects
>> being distinct from the set of JavaScript functions; and
>> formatting the set of JavaScript objects using the set
>> of JavaScript functions as a parameter; and
>> outputting at least a subset of the set of JavaScript
>> objects in a format determined by the set of JavaScript
>> functions.

'414 Patent, ECF No. 41-9 at 9:4-10:3.

## B. The '831 Patent

The '831 Patent claims a method for uncluttering hyperlinks
on a webpage. See ECF No. 41 at ¶¶ 62-63; '831 Patent, ECF No. 41-
9, 12:24-30. Specifically, the patented method unclutters
hyperlinks using a proximity policy that reformats hyperlinks by
looking at their spacing relative to other hyperlinks. See ECF No.

4

41 at ¶ 31. The inventors recognized that when numerous hyperlinks were packed into a small area it became difficult for users to interact effectively with the webpage. Id. at ¶ 62. For example, a user might mistakenly click a blank space or the wrong hyperlink. Id. One prior art solution involved using keystrokes to navigate sequentially through the links on a given page. Id. Another involved magnifying portions of the webpage. Id. But these techniques were not intuitive. Id. The '831 Patent preformats hyperlinks using its hyperlink-based proximity policy before showing the page to the user. See id. at ¶ 63. The proximity policy might take into account, for example, the number of hyperlinks per unit of measure on the page. Id. The proximity policy might also define the vertical or horizontal spacing between two or more hyperlinks using a number of points or pixels. Id. The result is hyperlinks that are appropriately scaled to account for both the display screen size and the amount of other clickable content on the screen. See id.

IBM asserts that Chewy infringes claims 1-10 of the '831 patent. ECF No. 41 at ¶ 151. Claim 1 reads in full:

> 1. A computer implemented method in a computer system
> for presenting a page, the method comprising:
>     receiving a page;
>     rendering the received page on a virtual display
>     to form a rendered page;
>     determining whether the rendered page falls
>     within a proximity policy;

> responsive to determining that the rendered page
> does not fall within the
> proximity policy, reformatting the rendered page
> on the virtual display to
> fall within the proximity policy to form a
> reformatted page, wherein the
> proximity policy defines a minimal spacing
> between links of a plurality of
> links within the page; and
> presenting the reformatted page to a user.

'831 Patent, ECF No. 41-9 at 12:17-31. Claims 2-10 are dependent on and limit Claim 1. Id. at 12:32-63.

## C. The '034 Patent

The '034 Patent magnifies web content ("objects") based on the type of the content (e.g., text or images) being enlarged. ECF No. 41 at ¶¶ 59-61; see '034 Patent, ECF No. 1-4 at 11:13-22. If the cursor is moved over a portion of text, for example, the text will be displayed in an increased font size. See '034 Patent, ECF No.1-4 at 5:16-41. If the cursor instead hovers over an image, a larger version of the image will be displayed. See id. at 5:42-46. And if the pointer hovers over an audio object, its volume will be increased. See id. at 7:22-25. The '034 patent recognizes that tools were previously "available for magnifying portions of the screen for a user." Id. at 2:6-7. But these tools "magnif[ied] a portion of the screen without regard for the type of content" and performed magnification "using pixel amplification," which magnifies the text or image but does not improve its clarity. Id.

at 2:7-17. For this reason, pixel amplification frequently produces blurry enlargements and "often does not increase the readability of the text being magnified or the details of the image." Id.

IBM has asserted that Chewy infringes claims 1-2, 8, 11, 16-20, 22, 29-30, 36, 39, 44-48, and 50-52 of the '034 patent. ECF No. 41 at ¶ 133. Claim 1, which is the focus of Chewy's argument and the parties' briefing,[1] recites:

> 1. A method in a data processing system for presenting a set of objects on a display within the data processing system, the method comprising:
>     responsive to detecting movement of a pointer over an object within the set of objects,
>     identifying an object [type] for the object,
>     wherein the object type is one of a plurality of object types,
>     and wherein more than one object in the set of objects may have a same object type;
>     and magnifying presentation of the object based on the object type of the object.

'034 Patent, ECF No. 1-4 at 11:13-22.

**D. The '443 Patent**

The '443 patent describes systems and methods relating to associating search result items with similar or related advertisements. See ECF No. 41 at ¶¶ 50-54; '443 Patent, ECF No.

_____

[1]   Chewy asserts that Claim 1 is representative; IBM disputes that assertion based on its identification of dependent claims with additional inventive concepts. For example, IBM cites claim 46, which is a means-plus-function claim for displaying the image using a second bitmap size having more pixels than the first bitmap size. ECF No. 55 at 27-29.

7

1-3 at 1:63-65. The '443 patent method specifically relies on a user's search results (rather than search queries) to determine which ads to show the user. ECF No. 41 at ¶ 51. How does this work in practice? First, a user performs a search. If the search returns a result, the system searches for advertisements related to that search result. IBM gives the example of a user who searches for "washing machine" and gets three search results: WashMax, CleanMaster, and HousePro. Id. The system then uses the information contained in the "WashMax" search result to look for advertisements related to that particular result. Id. The system could repeat the ad search process for both the CleanMaster and HousePro results. This approach to ad targeting stands in contrast to the "user profiling" approach, which was prevalent when the '443 patent was issued. Id. at ¶ 45. The user profiling approach extracted data from a user's browsing behavior on a particular site to determine their interests. Id. The approach therefore targeted ads based on a users' past browsing activity on a site, as opposed to their current search terms.

    IBM has asserted that Chewy infringes claims 1-20 of the '443 patent. ECF No. 41 at ¶ 115. Claim 5, which is representative, recites:

> 1. A method of targeting at least one associated advertisement from an Internet search having access to an information repository by a user, comprising:
>     identifying at least one search result item from a search result of said Internet search by said user;

```
            searching  for  said  at  least  one  associated
            advertisement within said repository using said at
            least one search result item;
            identifying  said  at  least  one  associated
            advertisement from said repository having at least
            one  word  that  matches  said  at  least  one  search
            result item;
            and
            correlating said at least one associated
            advertisement with said at least one search
            result item.
      5. A method of claim 1 further comprising:
            Designating said at least one search result item
      matched to said at least     one associated
      advertisement for subsequent selection by user.
```

'443 Patent, ECF No. 1-3 at 8:5-17, 8:27-30. On March 15,

2021, the PTAB granted <u>inter partes</u> review for claims 1-7, 9-17,

19, and 20 of the '443 patent.


## LEGAL STANDARD

To survive a motion to dismiss, a complaint (or, here, a

counterclaim) must "state a claim to relief that is plausible on

its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). All factual

allegations are accepted as true and all inferences are drawn in

favor of the pleader. <u>Mills</u>, 12 F.3d at 1174. "The issue is not

whether a plaintiff [or, here, a counterclaimant] will ultimately

prevail but whether the claimant is entitled to offer evidence to

support the claims." <u>County of Suffolk, N.Y. v. First Am. Real

Estate Solutions</u>, 261 F.3d 179, 187 (2d Cir. 2001). In addition to

the pleading, courts may also consider: (1) facts subject to

judicial notice; (2) documents incorporated in the pleading by

reference; or (3) documents integral to the pleading. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## ANALYSIS

I.  **IBM Plausibly Alleged Infringement of the '414 and '831 Patents**

A. The '414 Patent

Chewy contends that IBM has not plausibly alleged infringement of the '414 patent, arguing that IBM is wrong about how Chewy's website works, and that, if the Court takes Chewy's explanation of its JavaScript code as true, Chewy's website does not infringe IBM's '414 patent. Specifically, Chewy argues that its code deploys three separate HTTP requests, not the single request for JavaScript objects and functions that is the core of the '414 patent. But this is an argument for further down the line. IBM has alleged that Chewy's website does the single request that the '414 patent protects. See ECF No. 41 at ¶ 40 ("Chewy's request for 'a set of JavaScript objects and a set of JavaScript functions' is in a single HTTP request."). IBM also attached to its counterclaims infringement contentions that chart each element of the asserted claim with screenshots from Chewy's website, excerpts of code, and detailed factual allegations. See ECF No. 41-20. The infringement contentions identify HTML in Chewy's website that is purportedly responsive

to a single HTTP request to obtain both JavaScript objects and functions. Id. at 4. The infringement contentions also identify internal requests between Chewy's servers that, IBM alleges, infringe the '414 patent but are inaccessible to IBM before discovery. See id. at 17; ECF No. 55 at 9.

The Court finds that IBM's infringement contentions as to the '414 patent are more than sufficient to meet the plausibility pleading standard applicable at this stage in the litigation. And where a factual dispute remains, resolving the question of how the code works in practice is not appropriate at the motion to dismiss stage. Accordingly, Chewy's motion to dismiss as inadequately pleaded IBM's counterclaims as to the '414 patent is denied.

B. The '831 Patent

Chewy also alleges that IBM has not adequately pleaded infringement of the '831 patent. Specifically, Chewy contends that IBM does not allege infringement of the "virtual display" claim term. The Court disagrees. IBM exceeds what is required to plausibly allege that Chewy infringes the '831 patent by attaching detailed infringement contentions to its counterclaims. See ECF No. 41-24. As to the virtual display claim language, IBM's infringement contentions allege not only that "Chewy renders the received page on a virtual display to form a rendered page," as

required for infringement, id. at 8, but that it does so "by, for example, generating the data necessary to render the received page, including HTML, JavaScript, JSON files, images, and other data, and sending said data in HTTP Responses to Chewy users' computers and mobile devices," id. at 10. At this stage, the inquiry ends here. IBM's plausible allegations prevent dismissal of the '831 counterclaim. Accordingly, Chewy's motion to dismiss as inadequately pleaded IBM's counterclaim as to the '831 patent is denied.

## II.  Patent Invalidity Under Section 101 of the Patent Act

Patent invalidity is addressed by Section 101 of the Patent Act. See 35 U.S.C. § 101. Section 101, which defines the subject matter eligible for patent protection, has long been held to contain certain implicit exceptions: laws of nature, natural phenomena, and abstract ideas are not patentable. Mayo Collaborative Servs. v. Prometheus Labs, Inc., 556 U.S. 66, 70 (2012). Courts determine whether such an exception applies using a two-step test first laid out in Mayo and re-affirmed in Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217–18 (2014).

At step one, the court must determine whether the claims at issue are "directed to" one of the patent-ineligible concepts. Alice, 573 U.S. at 217. If so, then the court proceeds to step two, at which the court searches for an "inventive concept" that

ensures that the claim in practice amounts to "significantly more" than a patent ineligible concept. Id. This formulation makes clear that "the first stage filter is a meaningful one, sometimes ending the § 101 inquiry." Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016). But both steps "involve overlapping scrutiny of the content of the claims" and there "can be close questions about when the inquiry should proceed from the first stage to the second." Id. The Federal Circuit thus describes the first Alice step as "looking at the 'focus' of the claims, their 'character as a whole,'" and the second step, where reached, as "looking more precisely at what the claim elements add." Id.

If there are claim construction disputes that arise where Alice is applied at the motion to dismiss stage, the court may either adopt "the non-moving party's constructions" or "resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1125 (Fed. Cir. 2018).

Chewy contends that the claims of the '414, '831, '034, and '443 patents are patent ineligible under Section 101. Chewy argues that these claims are directed toward abstract ideas and do not contain any inventive concepts, and therefore fail Alice's two-step eligibility test. For the reasons that follow, the Court disagrees.

13

**A. The '414 Patent**

Briefly, the '414 patent describes a method for obtaining and formatting web content, using a single HTTP request to obtain separately stored data (JavaScript objects) and formatting instructions (Javascript functions). ECF No. 41 at ¶¶ 41-42. This approach solves previous challenges with having to maintain multiple JavaScript libraries of every object-function combination, which were difficult to maintain and required a great deal of storage space. As previously noted, the inventors of the '414 patent addressed these problems by, first, separating the data from the formatting functions. Id. at ¶ 38. Next, the patented approach passes the data (a set of JavaScript objects) as a parameter to a set of JavaScript functions that provide the formatting. Id. Finally, the '414 patent requires that this request for a decoupled set of JavaScript objects and JavaScript functions be contained in a single HTTP request. Id. at ¶ 42.

1. Alice Step One

In cases involving computer innovations, like this one, "the first step in the *Alice* inquiry . . . asks whether the focus of the claims is on the specific asserted improvement in computer capabilities." Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335 (Fed. Cir. 2016). An asserted improvement in computer functionality must have "the specificity required to transform a

14

claim from one claiming only a result to one claiming a way of achieving it." Ancora Techs., Inc. v. HTC Am., Inc., 908 F.3d 1343, 1349 (Fed. Cir. 2018). If the focus of the claims is "instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool," the claims fail at Alice step one. Enfish, 822 F.3d at 1336. Chewy argues that the '414 claims fall into the latter category. Chewy urges the court to view the claims as directed to "obtaining and formatting requests," an abstract idea that is not rendered patentable simply by limiting its application to JavaScript. See buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("[A]n attempt to limit the use of the abstract . . . idea to a particular technological environment . . . has long been held insufficient to save a claim in this context.").

Attempting to demonstrate that the '414 patent is directed to an abstract idea, Chewy analogizes the claims to a merchant who stocks unpainted doors and, in response to a customer's request for a door of a certain color, paints it whatever color the customer desires. But this analogy ignores the computer-specific nature of the claims. Each and every element of the challenged claims is limited to a computer-specific action. Use of a single HTTP request, for example, makes no sense outside of the computer context. Even viewing the claims abstractly, considering their practical effect rather than the limitation to the specific

technology itself, the analogy still does not line up. Whereas
JavaScript objects are dynamic data, such as an item's price or
rating, the door in Chewy's analogy never changes. And the paint
(the analogy to the JavaScript function) is just paint; it is not
adapted to different inputs the way that JavaScript functions are.
If the paint color is blue, the door will be painted blue.
Formatting does not depend on -- is not a "function" of -- which
door the customer receives.

Chewy's citations to Tenstreet, LLC v. DriverReach, LLC and
Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP are
unavailing. Both are prototypical examples of claims that use
computers "merely as a tool," Enfish, 822 F.3d at 1336, and are
distinguishable from the computer-specific claims in the '414
patent. In Tenstreet, the Federal Circuit invalidated a patent for
the "peer-to-peer sharing of job applicant verification data" over
a computer network. 826 F. App'x 925, 926 (Fed Cir. 2020). In
Encyclopaedia Britannica, the district court invalidated patents
for, respectively, "a computerized encyclopedia containing both
textual articles and graphical images" and an interactive
"computerized map system." 128 F. Supp. 3d 103, 106 (D.D.C. 2015),
aff'd, 653 F. App'x 764 (D.C. Cir. 2016). The peer-to-peer data
sharing patent in Tenstreet claimed "no technological improvement
beyond the use of a generic computer network." 826 F. App'x at
962. The encyclopedia and map patents in Encyclopaedia Britannica

16

merely computerized existing approaches to presenting information—
for example, showing a zoomed-in portion of a map. 128 F.Supp at
112. None of the patents at issue in these cases could reasonably
be portrayed as a "specific asserted improvement in computer
capabilities." Enfish, 822 F.3d at 1335.

Where, by contrast, inventions solve computer-specific
problems, the Federal Circuit has routinely held that the patents
are not abstract – and therefore are patent eligible – under Alice
step one. See Uniloc USA, Inc. v. LG Elecs. USA, Inc., 957 F.3d
1303, 1307 (Fed. Cir. 2020) (collecting cases). "[O]vercoming a
problem specifically arising in the realm of computer networks" is
patent eligible. Id. (quoting DDR Holdings, LLC v. Hotels.com, 773
F.3d 1245, 1257-59 (Fed. Cir. 2014)); see also Visual Memory LLC
v. NVIDIA Corp., 867 F.3d 1253, 1259-60 (Fed. Cir. 2017) (holding
patent eligible claims "focus[ed] on a 'specific asserted
improvement in computer capabilities,'" namely the accommodation
of different types of processors without compromising
performance); Core Wireless Licensing S.A.R.L. v. LG Electronics,
Inc., 880 F.3d 1356, 1359-63 (Fed. Cir. 2018) (holding patent
eligible claims directed to an improved user interface that enabled
users to more quickly access stored data and programs in small-
screen electronics).

The '414 patent was designed specifically to resolve the
problem in prior uses of JavaScript requiring the development of

multiple JavaScript libraries to hold combination of formatting
and content: the multiple libraries problem. ECF No. 41 at ¶ 41;
ECF No. 41-11 at ¶ 35. This problem was computer-specific; it arose
from the difficulties associated with developing, maintaining,
storing, and retrieving large amounts of computer code. See '414
Patent, ECF No. 41-3 at 1:42-2:9. The '414 patent further focuses
"on a specific means or method that improves the relevant
technology." McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d
1299, 1314 (Fed. Cir. 2016). Far from claiming the broad, abstract
idea of "obtaining and formatting requests,"[2] the '414 patent does
not even cover all methods of "obtaining and formatting requests"
to overcome the multiple libraries problem in JavaScript. See ECF
No. 41-11 at 14-17 (describing five alternative methods of solving
the multiple libraries problem). The '414 patent covers only a
specific mechanism, which involves, first, "decoupling" the
content from the formatting, then requesting the decoupled set of
content and formatting in a single HTTP request, and finally

---

[2]     Although step one looks broadly at the "character" and "focus
of the claims, see Elec. Power, 830 F.3d at 1353, describing the
concrete claims of the '414 patent at such a high level of
abstraction would risk letting exceptions to Section 101 swallow
the rule, see Alice, 573 U.S. at 217 (noting that "we tread
carefully in construing this exclusionary principle [of laws of
nature, natural phenomena, and abstract ideas] lest it swallow all
of patent law"); cf. Diamond v. Diehr, 450 U.S. 175, 189 n.12
(1981) (cautioning that overgeneralizing claims, "if carried to
its extreme, make[s] all inventions unpatentable because all
inventions can be reduced to underlying principles of nature which,
once known, make their implementation obvious").

obtaining the content and formatting directly in response to the HTTP request. ECF No. 41-11 18-19. As such, the Court finds that, for the purpose of this motion to dismiss, the '414 patent is patent eligible under Alice step one. Because the claims are not directed to an abstract idea, the court need not reach Alice step two. McRO, Inc., 837 F.3d at 1312. Chewy's motion to dismiss IBM's counterclaim as to the '414 patent on grounds of invalidity is thus denied.

**B. The '831 Patent**

Briefly, the '831 patent unclutters hyperlinks using a proximity policy that reformats hyperlinks by looking at their spacing relative to other hyperlinks. ECF No. 41 at ¶ 31. Otherwise, users face challenges navigating webpages with multiple hyperlinks if they are using a small screen or have any visual impairments. Id. at ¶ 62. The '831 Patent preformats hyperlinks using its hyperlink-based proximity policy before showing the page to the user. See id. at ¶ 63. The proximity policy might take into account, for example, the number of hyperlinks per unit of measure on the page. Id. The proximity policy might also define the vertical or horizontal spacing between two or more hyperlinks using a number of points or pixels. Id. The result is hyperlinks that are appropriately scaled to account for both the display screen

size and the amount of other clickable content on the screen. See
id.

    1. Alice Step One

    Chewy first argues that the '831 patent is directed to the
abstract idea of uncluttering documents based on spacing between
content.[3] To locate a potentially abstract idea, we look to the
actual language of the claims, Accenture Glob. Servs., GmbH v.
Guidewire Software, Inc., 728 F.3d 1336, 1345 (Fed. Cir. 2013)
("The important inquiry for a § 101 analysis is to look to the
claim."). On their face, the claims are drawn to the concept of
"uncluttering," i.e., appropriately spacing out content. Without
purporting to construe the claims, the steps of claim 1 require
(1) receiving the page; (2) rendering the page on a virtual
display; (3) determining if the page is cluttered; (4) reformatting
the page if it is cluttered, specifically using a "proximity policy
[which] defines a minimal spacing between links"; and
(5) presenting the reformatted page to the user. These are generic
steps for recognizing an untidy mass of content, or clutter, and
rearranging it so it is more appropriately spaced out.
"[A]ttempting to limit the use of [the idea] to a particular

---

[3]     Chewy mistakenly characterizes the '831 patent as applying
to "documents," when it in fact covers spacing protocol for
uncluttering any "page" on the web, see '831 Patent, ECF No. 41-
9 12:17-31. However, this does not save the patent claims from
being directed toward an abstract idea.

technological environment," or to web pages, or through the
inclusion of computer-specific terms like "page," "virtual
display," and "links," does not make the claims non-abstract. See
buySAFE, 765 F.3d at 1355 (citing Alice, 573 U.S. 222-23).

Comparing Claim 1 with the abstract claim in Ultramercial,
Inc. v. Hulu, LLC is illustrative. 772 F.3d 709, 715 (Fed. Cir.
2014). In Ultramercial, the Federal Circuit recognized that
displaying results in response to the abstract processes of
collecting and analyzing information is itself abstract. 772 F.3d
at 715. The patent-in-suit listed eleven steps for presenting an
ad before delivering free content. Id. Key steps included receiving
the media, selecting an ad after consulting an activity log to
determine whether the ad has been played less than a certain number
of times, and offering the media to the consumer in exchange for
watching the selected ad. Id. Claim 1 of the '831 patent is highly
similar in its level of specificity. See '831 Patent, ECF No. 41-
9 at 17-31. It first "receives" a particular type of content, then
"determines" what to do with that content by consulting and
applying specific parameters (replacing the activity log in the
Ultramercial claim with a proximity policy), and finally displays
the content to the user in accordance with those parameters. Both
ordered combinations of steps "recite[] an abstraction – an idea,
having no concrete or tangible form." See Ultramercial, 772 F.3d
at 715.

21

Claims 2-10 face the same deficiency as claim 1, on which they depend. Despite representing further attempts to limit claim 1 to specific technical environments, they do not change the focus of claim 1. Each remains "directed towards" the abstract idea of spacing out content. See '831 Patent, ECF No. 41-9 at 12:17-63. "[A]ny novelty in implementation of the idea," whether contained in Claim 1 or in its dependent claims, "is a factor to be considered only in the second step of the *Alice* analysis." See Ultramercial, 772 F.3d at 715. Thus, IBM's arguments that the '831 claims include inventive concepts for implementing the idea of uncluttering content are discussed below.

Attempting to portray the '831 Patent as a non-abstract improvement in computer functionality, IBM argues that the '831 patent solves the computer-specific problem of fitting hyperlinks onto a small screen. IBM notes that this problem became particularly acute when people began using their phones to browse the web. Id. But the spacing issue that the '831 patent resolves is not unique to small screens. The problem of fitting items into a small space is far from computer-specific. Although Chewy does not offer a real-world analogy for the '831 patent, the analogs abound. People re-arrange objects to more appropriately fit small spaces all the time, for example, by changing the line and word spacing in a resume to fit a single page. Nor are the methods claimed by the '831 patent specific to small screens. The claims'

22

broad language seeks to patent a method for uncluttering that is applicable to every webpage. Unlike the '414 claims and others found non-abstract in prior cases, the claim does not recite an improvement to a particular computer technology. Accordingly, for purposes of this motion to dismiss, the Court finds that the '831 patent claims are, in Alice's framing, "directed towards" an abstract idea. See Alice, 573 U.S. at 217.

    2. Alice Step Two

    Our inquiry does not, however, end there. Although the focus of the '831 patent claims is an abstract concept, at step two we "look[] more precisely at what the claim elements add." Elec. Power Grp., 830 F.3d at 1353. The '831 patent claims could contain "inventive concepts" that render them patentable depending on how the claim terms are construed. Claim 1, for example, requires rendering the page on a "virtual display." The virtual display limitation could be inventive if construed in a way that transforms the claims into a "specific asserted improvement in computer technology." See Enfish, 822 F.3d at 1327. Claims 2 and 7 implement the decluttering method in claim 1 using a specific combination of computer technologies, namely, HTML and "cascading style sheet information." '831 Patent, ECF No. 41-9 at 12:32-34, 12:49-52. Claims 4 and 5 apply the steps in Claim 1 to a "markup language document." Id. at 12:39-44.

Although the Court is skeptical that the limitations on claims 2-10 would amount to more than an "attempt to limit the application of the idea to a specific technological environment," it is possible that the computer-specific components of the claim, depending on how they are construed, could demonstrate that each claim has "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." Ancora Techs., 908 F.3d at 1349. The '831 patent claims could amount to "significantly more" than the patent ineligible concept towards which they are directed. See Alice, 573 U.S. at 217.

These claim construction issues do not necessarily prevent the court from proceeding with the analysis under Alice step two. The court could adopt "the non-moving party's constructions" or "resolve the disputes to whatever extent is needed to conduct the § 101 analysis." Aatrix, 882 F.3d at 1125. However, given that neither party had asked for a specific construction of each of the terms in the '831 patent, the Court finds that these issues are best addressed after claim construction. Accordingly, Chewy's motion to dismiss IBM's counterclaim as to the '831 patent as patent ineligible is denied at this stage.

## C. The '034 Patent

Briefly, the '034 patent magnifies web content ("objects") based on the type of the content (e.g., text or images) being

24

enlarged. ECF No. 41 at ¶¶ 59-61; see '034 Patent, ECF No. 1-4 at 11:13-22. If the cursor is moved over a portion of text, for example, the text will be displayed in an increased font size, see '034 Patent, ECF No. 41-7 at 5:16-41, if the cursor instead hovers over an image, a larger version of the image will be displayed, see id. at 5:42-46, and if the pointer hovers over an audio object, its volume will be increased. See id. at 7:22-25. Chewy asserts that Claim 1 is representative; IBM disputes that assertion based on its identification of dependent claims with additional inventive concepts. For example, IBM points to claim 46, which is a means-plus-function claim for displaying the image using a second bitmap size having more pixels than the first bitmap size.

For the reasons that follow, for purposes of this motion to dismiss, the Court finds that '034 patent claims are not directed toward an abstract idea of magnification, but instead are patent eligible as a specific improvement to a computer graphical user interface.

1. Alice Step One

Chewy argues that the '034 patent is directed to the abstract idea of magnifying content based on its type, only requiring, generically, (a) detecting the "object type" located at the pointer and (b) magnifying the object. Chewy argues that the independent claims of the '034 patent lack any detail about how the method is performed and do not recite any of the magnification "techniques"

25

that are part of IBM's expert declaration regarding the patent content. Chewy adds that the dependent claims merely narrow the claim scope to specific object types or contexts without providing any technical detail about how they are performed. Chewy argues that this is thus like Move, Inc. v. Real Est. All. Ltd., in which the court found the patent claims were directed toward an abstract concept where the method included a step that zoomed in on maps to identify available real estate. 721 F. App'x 950, 957 (Fed. Cir. 2018).

But that analogy is unavailing: the zoom function at issue in the claim in Move, Inc. was just one step of a patent claim that was in actuality implementing, with a computer, a real estate practice of identifying available properties. The claim at issue in Move, Inc. was not an improvement to any technology itself, and was certainly not directed to improving how the technology executes a zoom function in a more useful way, as the '034 patent does here.

IBM argues that the '034 patent improves a computer graphical user interface by magnifying objects in an unconventional way; where prior conventional techniques worked like a physical magnifying glass, the techniques in the '034 patent magnify content based on object type based on detecting the movement of the pointer over an object and monitoring for a change in focus. ECF No. 55 at 23-24. IBM argues that this is a claim "directed to an improved user interface for computer devices" and thus patent eligible. Id.

26

at 24-26. Comparison to the claims in Core Wireless is instructive. 880 F.3d at 1362-63. In Core Wireless, the court considered claims that were directed to a particular manner of summarizing and presenting information on electronic devices that represented an alternative to conventional user interface methods. 880 F.3d at 1360. While the claims in Core Wireless dealt with the display of a user screen, they were similarly directed at improving the user interface on electronic devices, which the '034 patent does here through a method in the data processing system that allows more nuanced and automatically responsive zoom features.

IBM asserts that until claim construction resolves disputes about terms like "object type," resolution of the patent eligibility question at the pleadings stage is inappropriate. Chewy argues that regardless of how "object type" is construed, the '034 patent claims would have to be more specific about how the magnification occurs, which they do not do. The Court agrees with IBM. Chewy's motion to dismiss IBM's counterclaim as to the '034 patent on the ground that the patent is invalid is thus denied.

### D. The '433 Patent

Briefly, the '443 patent describes systems and methods relating to associating search result items with similar or related advertisements. See ECF No. 41 at ¶¶ 50-54; '443 Patent, ECF No.

1-3 at 1:63-65. The '443 patent method specifically relies on a user's search results to determine which ads to show the user. ECF No. 41 at ¶ 51. The system uses the search results to look for advertisements related to that particular result, rather than using only the ads related to the search queries themselves or relying on any kind of user profile to identify advertisements. Id.

1. Alice Step One

Chewy argues that claim 5 incorporates independent claim 1 and is representative of all the asserted claims of the '443 patent, and that claim 5 is directed to the abstract idea of targeting advertising based on search results. Chewy also argues that claim 5 is too general and thus not directed to a specific improvement to the functioning of any software, hardware, or technology.

IBM counters that the claims of the '443 patent are directed to a specific way to improve targeted advertising and describe how ad targeting happens. IBM distinguishes various cases involving online advertisements as not patent eligible because they did not address specific technical solutions, i.e., they did not describe how advertisements were targeted, unlike here, where IBM argues the claims describe how the ad targeting happens, by correlating search results with advertisements using keywords. IBM instead

28

analogizes to claims found patent eligible in Packet Intelligence
LLC v. NetScout Sys., Inc., because they involve correlating
information in a nonconventional way, 965 F.3d 1299, 1307-10 (Fed.
Cir. 2020). As IBM describes it, both sets of claims extract
information from a particular type of data, match that information
with a database, and use that process to solve a technical problem
in a new way. Chewy argues that the claims in Packet Intelligence
described in much greater detail how the patent implemented the
technical solution at issue there, and that, in contrast, the
generic terms used in the '443 claims are insufficient descriptions
to survive Alice step one. IBM counters by pointing to various
terms in different claims that are specific to the technology:
"information repository," "user identifier," "URL . . .
identifier," "off-line batch process," and "true/false
designator."

     In Packet Intelligence, in contrast, the problem solved by
the patent claims was technological in itself, namely, network
security. Here, the problem to be solved is an advertising success
problem, not a technological one. Finding a new (albeit
technological) way to provide users with more ads they might be
interested in is not solving a technological problem. Chewy focuses
on the lack of specificity in the '443 patent claims, but even
minimal detail in the claim limitations themselves is not alone
fatal on Alice step one. For example, in SRI Int'l, Inc. v. Cisco

Systems, Inc., the claims recited general steps for network monitoring, with minimal detail present in the claim limitations themselves; however, the court found that the claims were not directed to an abstract idea because they were "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks." 930 F.3d 1295, 1301-03 (Fed. Cir. 2019). The Court is, however, not convinced that IBM's '443 patent claims are necessarily rooted in computer technology in order to solve a specific problem in the technology of web advertising. The claims in SRI may have similarly lacked detail, but they did include technical terms necessarily identifying the method as a technological solution to a technical problem.

The Court agrees with Chewy that the '443 patent claims lack specificity. Despite IBM's arguments that this is an innovative and unconventional approach to identifying ads based on search results rather than search queries, the claims themselves do not describe a technical solution to a technical problem. While the '443 patent claims are therefore directed toward an abstract concept, the Court then considers whether they contain inventive concepts under Alice step two.

### 2. Alice Step Two

Although the focus of the '443 patent claims is an abstract concept, at step two we must "look[] more precisely at what the

claim elements add." Elec. Power Grp., 830 F.3d at 1353. A claim contains an inventive concept if it "include[s] additional features" that are more than "well-understood, routine, conventional activities." Alice, 573 U.S. at 221, 225. When "[t]he claim language does not provide any specific showing of what is inventive about the [limitation in question] or about the technology used to generate and process it," the claims do not satisfy Alice's second step. Move, Inc., 721 F. App'x at 957.

Most of IBM's arguments are directed toward the '443 patent claims' unconventional approach to internet advertising. IBM points to its expert declaration of how the claim techniques function, explaining the benefits as compared to previous approaches to targeted advertising in e-commerce. ECF No. 55 at 19-22. Whether this declaration can properly be considered on the instant motion is problematic, but the Court need not reach this issue, because what IBM needs to point to is the claim limitations themselves, which must show something of what is inventive about the limitation or the technology used to generate and process it. See Move, Inc., 721 F. App'x at 957.

Chewy argues that the claims do not contain inventive concepts where they simply recite routine functions of "identifying," "searching," "correlating," and "designating" information. Chewy compares these patent claims to In re Morsa, where the representative claim described targeting advertisements for a user

31

and using a bidding system to select which ad would be displayed — essentially just tacking on that these advertising techniques would be done "at/by the computer system over a network." 809 F. App'x 913, 915-18 (Fed Cir. 2020). The claims at issue in the '443 patent, however, do not simply describe conventional ad techniques and then tack on that they will be executed with a computer or with Internet technologies. In re Morsa is thus not an apt comparison.

More broadly, the Alice step two issue here is hard to resolve prior to claim construction, especially where IBM argues that the claim terms in sequence and taken together constitute the inventive concept. Depending on the construction of the claim terms, it is possible that the method in the claim technologically implements this function in an unconventional way. That would be enough to find that the claim limitations add inventive concepts so as to make this patent eligible. The '443 patent claims could contain "inventive concepts" that render them patentable under Alice step two, depending on how the claim terms are construed. The Court thus elects not to resolve these issues prior to full claim construction and without the benefit of the parties' briefing on claim construction. Accordingly, Chewy's motion to dismiss IBM's counterclaim as to the '443 patent on grounds of invalidity is denied at this stage.

### III. Staying Litigation With Regard to the '443 Patent

Finally, Chewy moves to stay litigation with regard to the '443 patent based on the IPR proceeding before the PTAB, which was granted on March 15, 2021, regarding 18 of the asserted 20 claims of the '443 patent. Courts consider three factors in determining whether it is appropriate to stay proceedings pending resolution of IPR proceedings: "(1) whether a stay will simplify the issues in question and trial of the case; (2) the stage of the proceedings; and (3) whether a stay will prejudice the nonmoving party." Rovi Guides, Inc. v. Comcast Corp., 2017 WL 4876305, at *3 (S.D.N.Y. 2017).

Comparison to Intell. Ventures II L.L.C. v. JP Morgan Case & Co. is instructive. 2014 WL 10919562, at *3 (S.D.N.Y. 2014). The court denied the request to stay the case pending the PTAB's resolution of the IPR proceeding on similar facts to this case: the IPR proceeding concerned only one of the five patents in the case and the alleged infringer was not party to the IPR proceeding. Id. In Intell. Ventures II, however, the case had progressed further than in this case, where the court had conducted a claim construction hearing and most written discovery had been completed. The court reasoned that all factors weighed against granting a stay. Here, Chewy requests a stay only as to the '443 patent, not as to the entire case, but Intell. Ventures II is nevertheless useful. The parties in this case have only just

exchanged proposed claim constructions, claim construction briefing will close September 2, 2021, and the claim construction hearing itself is scheduled for September 17, 2021. Thus, the second factor, the stage of the proceedings, does not weigh against a stay as strongly as in Intell. Ventures II. But the other factors do weigh against a stay, for the reasons outlined in Intell. Ventures II. An IPR can take up to 18 months in the PTAB followed by two years of appellate review in the Federal Circuit. As the court in Intell. Ventures II noted, an up to three-year stay as to one of five patents in this case does not streamline the case, particularly where the streamlining effect after three years is only speculative.

In contrast, the court granted a stay in Rovi where four of five patents at issue in the case were subject to IPR proceedings (compared to one of five in this case), the alleged infringer was also party to the IPR proceedings (and would thus be limited in the arguments it could make following resolution of the IPR, unlike Chewy here), and there was no undue prejudice where the parties were not primarily marketplace competitors, even though the parties had already fully briefed the issue of claim construction (which weighed against a stay, and would not weigh against a stay as strongly in this case). 2017 WL 4876305, at *3–*5.

An up to three-year stay as to one of five patents in this case does little to streamline the matter, particularly where the

34

streamlining effect after three years is only speculative. Furthermore, any effect is necessarily incomplete where the IPR does not concern all asserted claims of the patent and where Chewy is not a party to the IPR and thus not limited or precluded concerning any pleading or argument it wants to make. As such, Chewy's motion to stay litigation with respect to the '443 patent is denied.

## CONCLUSION

For the reasons above, the Court held by bottom-line order on August 04, 2021 that Chewy's motion to dismiss is denied in full. ECF No 61.

The Clerk is directed to close the entry at docket number 49.

SO ORDERED.

Dated:     New York, NY
           August 23, 2021                     _____
                                               JED S. RAKOFF, U.S.D.J.