UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
CHEWY, INC.,                        :
                                   :
     Plaintiff,                    :
                                   :    21-cv-1319 (JSR)
          -v-                      :
                                   :    MEMORANDUM ORDER
INTERNATIONAL BUSINESS MACHINES    :
CORPORATION,                       :
     Defendant.                    :
                                   :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

     This Order sets forth the Court's patent claim constructions

pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370,

(1996), as well as addresses a pending motion.

     The Court here assumes the parties' familiarity with the facts

and prior proceedings of this case.  See Chewy, Inc. v. Int'l Bus.

Machines Corp., 2021 WL 3727227 (S.D.N.Y. Aug. 23, 2021).  As

relevant here, on February 15, 2021, plaintiff Chewy, Inc. filed

the instant action against defendant International Business

Machine Corporation ("IBM") seeking a declaratory judgment of

noninfringement as to four of IBM's patents.  On April 19, 2021,

IBM filed its answer along with counterclaims for infringement of

those same four patents.  Then, on May 24, 2021, IBM filed its

amended answer and added a counterclaim for infringement of a fifth

patent.  On August 18, 2021, Chewy filed its answer to IBM's

counterclaims.

Before the Court now are the parties' various disputes over claim construction as well as Chewy's unopposed motion to amend its affirmative defenses to IBM's counterclaims.

## BACKGROUND

The patents at issue here claim improvements to certain web-based technologies.  The claims of each of the five patents – U.S. Patent Nos. 7,072,849 ("Patent '849"), 9,569,414 ("Patent '414"), 7,076,443 ("Patent '443"), 6,704,034 ("Patent '034"), and 7,496,831 ("Patent '831")– are briefly summarized below.

### A. Patent '849

Patent '849 claims a method for presenting advertising to a user of an interactive service in a manner intended "to minimize interference with retrieval and presentation of application data" by, among other things, "storing and managing" such advertising at the user's reception system — that is, the user's terminal — before being requested by the user.  ECF No. 1-1 (Patent '849) at 1:16-28, 3:15-20.  The patent also claims a method of "individualizing the advertising supplied to enhance potential user interest by providing advertising based on a characterization of the user as defined by the user's interactions with the service, user demographic and geographical location."  Id. at 3:24-29.

### B. Patent '414

Patent '414 describes a method for obtaining and formatting web content.  ECF No. 41-3 ("Patent '414") at 9:4-17.  Prior to

2

the invention of Patent '414, each combination of data (JavaScript objects) and formatting (JavaScript functions) had to be stored in a separate JavaScript library.  See id. at 1:14-50.  If developers wanted the same data in a different format, they had to create an entirely new library.   Id.   This created complexities for integrating third party content into a page, raised software compatibility issues, and required maintaining updates across various libraries, among other issues.   Id.   The inventors of Patent '414 addressed these problems by, first, separating the data from the formatting functions.  Id. at 1:54-56.  Then, the patented approach passes the data (a set of JavaScript objects) through a set of JavaScript functions that then outputs the data in a format determined by the JavaScript functions.  Id. at 1:58-62.

**C. Patent '443**

Patent '443 describes systems and methods relating to associating search result items with similar or related advertisements.  ECF No. 1-3 ("Patent '443") at 1:63-65.  The Patent '443 method specifically relies on a user's search results (rather than search queries) to determine which advertisements to show the user.  Under this method, a user first performs a search. Id. at 2:23-39.  If the search returns a result, the system searches for advertisements related to that search result.  Id. This approach to ad-targeting stands in contrast to the "user

profiling" approach, which was prevalent when Patent '443 was issued.  Id. at 1:15-45.  The user profiling approach extracted data from a user's browsing behavior on a particular site to determine the user's interests.  The approach therefore targeted ads based on a user's past browsing activity on a site, as opposed to the user's current search terms.  Id.

**D. Patent '034**

Patent '034 magnifies web content ("objects") based on the type of the content (e.g., text or images) being enlarged.  See ECF No. 1-4 ("Patent '034") at 11:13-22.  If the cursor is moved over a portion of text, for example, the text will be displayed in an increased font size.  See id. at 5:16-41. If the cursor instead hovers over an image, a larger version of the image will be displayed.  See id. at 5:42-46.  And if the cursor hovers over an audio object, its volume will be increased.  See id. at 7:22-25.  The '034 patent recognizes that tools were previously "available for magnifying portions of the screen for a user."  Id. at 2:6-7.  But these tools "magnif[ied] a portion of the screen without regard for the type of content" and performed magnification "using pixel amplification," which magnifies the text or image but does not improve its clarity.  Id. at 2:7-17.  For this reason, pixel amplification frequently produces blurry enlargements and "often does not increase the readability of the text being magnified or the details of the image."  Id.

4

**E. The '831 Patent**

The '831 Patent claims a method for uncluttering hyperlinks on a webpage.  See ECF No. 41-9 ("'831 Patent") 12:24-30. Specifically, the patented method unclutters hyperlinks using a proximity policy that reformats hyperlinks by looking at their spacing relative to other hyperlinks.  See id. at 3:7-15.  The inventors recognized that when numerous hyperlinks were packed into a small area it became difficult for users to interact effectively with the webpage.  Id. at 2:25-42.  One prior art solution involved using keystrokes to navigate sequentially through the links on a given page.  Id.  Another involved magnifying portions of the webpage.  Id.  But these techniques were not intuitive.  Id.  In contrast, the '831 Patent automatically unclutters and reformats a webpage to address the spacing between the link before presenting it to a user.  Id. at 1:7-10.

## CLAIM CONSTRUCTIONS

First, the Court addresses the parties' claim construction disputes. With regard to the five patents at issue, the parties dispute the construction of a total of approximately two dozen terms, implicating thirteen independent claims and a number of additional dependent claims.  After the parties had extensively briefed their respective positions, the Court conducted a lengthy

"Markman" hearing on October 8, 2021.  See Transcript, October 8, 2021 ("Tr.").

The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of invention.  Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."  Id. at 1321.

**A. Claim Constructions for Patent '849**

The claim construction issues discussed in this section relate to the following four independent claims of Patent '849, as well as a number of dependent claims:

**Claim 1:**  A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications, from the network, that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of: a. structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display; and b. structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications, wherein structuring the advertising includes configuring the advertising as objects that include advertising data and; c. selectively storing advertising objects at a store established at the reception system.

**Claim 8:**  A method for presenting advertising in a computer network, the network including a multiplicity

6

of user reception systems at which respective users can request applications that include interactive services, the method comprising the steps of: a. compiling data concerning the respective users; b. establishing characterizations for respective users based on the compiled data; and c. structuring advertising so that it may be selectively supplied to and retrieved at the reception systems for presentation to the respective users in accordance with the characterizations established for the respective reception system users, wherein structuring advertising includes supplying advertising data to the reception system and storing a predetermined amount of the advertising data in a store established at the respective reception systems.

**Claim 14:** A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications from the network that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of: a. structuring applications so that a user requested application may be presented, through the network, at a first portion of one or more screens of display; b. separately structuring the advertising in a manner compatible to that of the applications so that advertising may be presented, through the network, at a second portion of one or more screens of display concurrently with any one of a plurality of user requested applications, c. configuring the advertising as objects that include advertising data, and d. selectively storing advertising objects at a store established at the reception system.

**Claim 21:** A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request, from the network, applications that include interactive services, the method comprising the steps of: a. compiling data concerning the respective users; b. establishing characterizations for respective users based on the compiled data; and c. structuring advertising separately from the applications so that the advertising may be selectively supplied, through the network, to and

7

retrieved at the reception systems for presentation to the respective users along with a requested application in accordance with the characterizations established for the respective reception system users, wherein supplying advertising data to the reception system includes storing a predetermined amount of the advertising data in a store established at the respective reception systems.

1. **"selectively storing advertising objects at a store established at the reception system"** (claims 1 and 14)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| storing advertising objects according to a predetermined storage criterion at a store established at the reception system | pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications |

The primary dispute with regard to this term is whether "advertising objects" must be "pre-fetched" (as explained below). Chewy's proposed construction, requiring that the objects be "pre-fetched," is the one previously adopted in two cases brought by IBM asserting this patent. See Int'l Bus. Machines Corp. v. Priceline Grp. Inc., 2016 WL 6405824, at *19-21 (D. Del. Oct. 28, 2016); Int'l Bus. Machines Corp. v. Groupon, Inc., 2017 WL 3310688, at *9 (D. Del. Aug. 3, 2017). As the Priceline court explained, the specification "clearly describes the 'invention' as a whole as including 'pre-fetched' advertising as an improvement over the prior art, with such advertising being displayed 'concurrently' with applications." 2016 WL 6405824, at *10. In particular, the patent method was intended to speed up the display of

advertisements – an important advantage in the days of dial-up connections – by "eliminat[ing] from the new page response time the time it takes to retrieve an advertising object from the host system based on a user's characteristics.  This is accomplished by using the . . . pre-fetching mechanism," whereby the user's system downloads and stores the advertising in advance, before it is needed for viewing — that is, it pre-fetches the advertising. Patent '849 at 34:21-44.

Chewy's construction, which reads the term "selectively storing" to include "pre-fetching" the advertising objects, is thus consistent with the description of the invention as a whole — most notably the "Summary of Invention," which explains that "in accordance with the method [of the invention], the user reception system at which the advertising is presented includes [a] facility for storing and managing the advertising so that it can be pre-fetched from the network and staged at the reception system in anticipation of being called for presentation."  Patent '849 at 3:16-21.  This interpretation is also supported by the history of proceedings in the Patent and Trademark Office – that is, the prosecution history: in an appeal brief, IBM explained that "selectively storing advertising objects" means that the advertising objects are "pre-fetched from the network" and stored at the user's reception system."  ECF No. 72-6 at 6-7.

IBM, on the other hand, now seeks to have the term construed in accordance with a portion of the specification that discusses "objects" generally — that is a portion of the specification stating that "[the reception system] includes a means to selectively store objects according to a predetermined storage criterion". ECF No. 68 ("IBM OB") at 2 (quoting Patent '849 at 6:57-61); see Priceline, 2017 WL 3310688, at *9. IBM argues that its construction is consistent with the prosecution history because during prosecution the Board of Patent Appeals and Interferences ("BPAI") stated that "selectively storing advertising objects at a store established at the reception system" means, in part, that "advertising objects (entities) are selected by the system for storing at the reception system." ECF No. 68-2 at 9. However, as Chewy explains, this portion of the prosecution history is not inconsistent with Chewy's interpretation, because "pre-fetching advertising objects" requires, by definition, that those advertising objects were "selected by the system," as fetching requires first making a selection.

IBM also raises a series of objections to Chewy's interpretation — expounded upon at oral argument — grounded in the language of the specification and the claims. Ultimately, however, none succeeds in refuting Chewy's argument that a proper construction reflects that "selectively storing" involves "pre-fetching." First, IBM argues that the addition of the adverb

10

"selectively" to "storing" cannot convert the single step of "storing" into the two steps of "pre-fetching" advertising objects and then "storing" those objects.  However, "selectively storing" the advertising objects necessitates a selection process prior to storage — the second action is thus implied.  And, when read in the context of the specification, is clear that the selection process involves pre-fetching based on a user's characteristics.

Next, IBM raises a claim differentiation argument.  As IBM notes, claims 9, 10, 22 and 23 explicitly use the term "pre-fetch," while claim 1 and 14 do not – thus, IBM states, prefetching only applies to those claims.  However, claims 9 and 10 are dependent claims of independent claim 8, while claims 22 and 23 are dependent claims of independent claim 21.  Notably, neither claim 8 nor claim 21 contain the "selectively storing" limitation, which appears in claims 1, 13, and 14 (and their dependent claims).  More importantly, IBM incorrectly assumes that mention of "pre-fetching" in dependent claims 8, 10, 22, and 23 is to express a new limitation.  However, when read in context, it is clear that each claim is describing the use of "pre-fetching" under the specific circumstances discussed in those claims.  For example, claim 22 discusses pre-fetching "when the store of advertising data falls below a predetermined level."  Thus, the use of the term "prefetching" in those terms does not demonstrate that the more general concept of prefetching cannot also be encompassed by

other claim terms, such as "selectively storing."  Indeed, as the Federal Circuit has noted, "[i]t is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved." Hormone Research Found. v. Genentech, Inc., 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990).

IBM also argues that the language from the "Summary of Invention" relied upon by Chewy — "managing the advertising so that it can be pre-fetched," Patent '849 at 3:16-24 (emphasis added) — uses the permissive "can" in describing pre-fetching, which, IBM suggests, implies that pre-fetching is not necessary to the patented method.  However, "can" in the at-issue sentence is not used to indicate permissiveness.  Rather, it is used to explain that, "in accordance with the method, the user system . . . includes facility for storing and managing the advertising," because that facility is necessary to carry out pre-fetching, which is itself an integral part of the patented method.  Id.  Thus, the overall sentence is consistent with understanding pre-fetching to be a necessary feature of the patented method.

Finally, IBM argues that Chewy's interpretation excludes a preferred embodiment where "objects make up one or more partitioned applications, and are retrieved on demand by a user's [reception system] for interpretive execution and selective storage." '849 Patent at 6:18-24 (emphasis added).   IBM argues that in this

12

embodiment, "selective storage" occurs when objects are "retrieved on demand" — that is, in response to a "demand" — and thus are not "pre-fetched."  However, this preferred embodiment is referring to the storage of objects that "make up" the "applications," not advertising objects.  Id.  In contrast, the patent consistently describes advertising objects as pre-fetched and stored for future use.

As the above reflects, a proper construction of the disputed terms reflects that the advertising objects must be "pre-fetched." That said, juror's may not be familiar with using the term "fetch" or, relatedly, "pre-fetch," to describe retrieving objects in this context.  More understandable is the word "retrieving," which — in combination with the language from Chewy's construction stating that the storing occurs in "anticipation of display concurrently with the applications" — appropriately captures the meaning of the word "pre-fetching" but in language more accessible to a jury.[1]

For these reasons, the Court adopts the following construction for the term at issue: **"retrieving advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications."**

---

[1] See Jed S. Rakoff, Down with Patentese, 21 Fordham Intell. Prop. Media & Ent. L.J. 839, 840 (2011) (noting, inter alia, the tendency of patent lawyers and cases to substitute obscure or confusing terms for simple English words).

## 2. "structuring advertising separately from the applications so that the advertising may be selectively supplied, through the network, to and retrieved at the reception systems for presentation" (claim 21)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| formatting advertising in a manner comparable to that of applications to enable the applications to be presented at a first portion of a display and the advertising to be presented concurrently at a second portion of a display and so that it may be selectively supplied to, through the network, and retrieved at the reception systems | formatting advertising separately from the applications for potential supply, through the network, to and retrieval by the reception systems for presentation |

With regard to this term, the parties primarily dispute whether the phrase "separately from the applications" requires further elaboration. Although conceding that "'separate' is a non-technical word," IBM argues that "the jury would benefit from an explanation" and that elaboration would resolve the parties' "dispute as to the claim scope." ECF No. 73 ("IBM RB") at 5. As such, IBM argues that the construction should replace "separately" with language taken from the specification explaining that the "advertising is structured in a manner [that] enables the applications to be presented at a first portion of a display associated with the reception system and the advertising to be presented concurrently at a second portion of the display." Patent '849 at 3:10-16.

14

Chewy argues against elaborating "separately" in the manner advocated by IBM, stating that it improperly limits that scope of the disputed terms. In particular, Chewy notes that the limitation proposed by IBM — "in a manner comparable to that of applications to enable the applications to be presented at a first portion of a display and the advertising to be presented concurrently at a second portion of a display" — already appears in other independent claims utilizing similar language. See, e.g., Patent '849 at 1, 13, & 14. Given that the patentee chose not to recite such limitations in claims 8 and 21, there is no basis for limiting the "structuring advertising . . . selectively supplied" terms in the manner proposed by IBM. See Kara Tech. Inc. v. Stamps.com Inc., 582 F.3d 1341, 1347 (Fed. Cir. 2009) ("[W]hen the inventor[s] wanted to restrict the claims to require [such limitations], [they] did so explicitly.").

A second dispute surrounds Chewy's proposal to include the phrase "potential supply" to construe "may be . . . supplied." Chewy argues that this is consistent with the decisions in Priceline and Groupon, where the Court recognized that "the intrinsic record does not support including a requirement in [the] term that advertising actually be used" — or in this instance, supplied — and that it is therefore appropriate to "add the word 'potential.'" Priceline, 2016 WL 6405824, at *11; accord Groupon, 2017 WL 3310688, at *4. IBM does not dispute this point, but

instead notes that its proposal achieves the same result, while using the permissive language — "may" — used in the claim itself.

As both parties essentially agree, the term "separately" is no being used in some technical sense. Because the term is non-technical, no further construction is needed to give it the meaning that would be accorded to it by "a skilled artisan." Carnegie Inst. of Washington v. Pure Grown Diamonds, Inc., 459 F. Supp. 3d 502, 516 (S.D.N.Y. 2020). Moreover, and more importantly, IBM fails to explain why the Court should import into the claim a limitation that appears explicitly in other claims. On the other hand, on the issue of the permissive language, IBM's proposal is clearer and hews closer to the claim language.

The Court accordingly adopts the following construction: "**formatting advertising separately from the applications so that the advertising may be selectively supplied, through the network, to and retrieved at the reception systems for presentation.**"

   3. "**structuring advertising so that it may be selectively supplied to and retrieved at the reception systems for presentation**" (claim 8)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| formatting advertising in a manner comparable to that of applications, and so that it may be selectively supplied to and retrieved at the reception systems, to enable the advertising to be presented | formatting advertising for potential supply to and retrieval by the reception systems for presentation |

As both parties agree, this term is identical to the one described above except that it does not include the phrases (1) "separately from applications" or (2) "through the network."  As such, the construction should be identical but omit the language corresponding to those two phrases.

The Court accordingly adopts the following construction: **"formatting advertising so that it may be selectively supplied to and retrieved at the reception systems for presentation."**

4. **"advertising object(s)" (claims 1, 2, 3, 14, 15, 16)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| objects that (1) contain display data to be presented at screen partitions and (2) whose subject matter is selected to concern advertising | data structure(s) whose subject matter concerns advertising |

The parties agree that "object(s)" should be construed as "data structure(s)."  ECF No. 62 at 1.  The parties further agree that advertising objects are defined by the patent as data structures whose "subject matter is selected to concern advertising."  Patent '849 at 15:8-11.  However, IBM argues that the construction should further require that "advertising objects" also "contain display data to be presented at screen partitions."  In support, IBM notes that the specification defines advertising objects as "substantially the same as page element objects, with the difference being that, as their name implies, their subject

17

matter is selected to concern advertising." Id. at 15:6-12. "Page element objects," in turn, are defined as follows: "Page element objects . . . contain the display data, i.e., text and graphics, to be presented at screen partitions." Id. at 14:49-51.

Putting these together gives rise to a definition of advertising objects as data structures that "contain the display data to be presented at screen partitions" and "concern advertising." IBM argues that this definition is further supported by how the term "advertising objects" is used in the specification, including its figures. See id. at 12:38-41 ("in accordance with the method of the present invention, advertising objects . . . include the text and graphics that may be presented . . . on the monitor screen"); see also id. at 11:21-28 & fig. 4c).

Chewy argues that this additional limitation lacks basis in the specification and introduces unnecessary ambiguity. Specifically, relying on an expert declaration, Chewy argues that that using the word "partitions" is ambiguous because it introduces the questions of "whether [the objects] must be presented at multiple partitions, and what defines separate 'screen partitions.'" ECF No. 71 ("Almeroth Dec.") ¶ 72. IBM responds that, to the extent any additional clarity is needed, the specification explains that "partitions" are "areas." See Patent '849 at 16:15-16; see also Groupon, 2017 WL 3310688, at *4 (defining "partition" as "area" in connection to a related patent).

18

Chewy's arguments for ambiguity are only cursorily stated without substantiation beyond expert say-so and thus not convincing.  See Phillips, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court").  Moreover, they do not counter the fact that IBM's definition is derived directly from how the terms are defined in the specification and accurately reflects how the term is used within the specification.  See Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) ("the inventor's lexicography governs").

The Court accordingly adopts IBM's proposed construction of this term, i.e., **"objects that (1) contain display data to be presented at screen partitions and (2) whose subject matter is selected to concern advertising."**

5. **"characterization(s)" (claims 3, 4, 5, 6, 7, 8, 16, 17, 18, 21)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| targeting criteria for users as defined by interaction history with the service and such other information as user demographics and locale | data indicative of a user characteristic, such as demographics, geography, or usage history |

Chewy raises only one issue with IBM's proposal: that it suggests that all characterization need to be based at least partially on a user's "interaction history."  IBM responds that this is not its intention and suggests, as an alternative, that

19

this issue be avoided by construing the term as "targeting criteria for users as defined by interaction history with the service <u>and/or</u> such other information as user demographics and locale."

IBM raises the separate issue that Chewy's proposal fails to distinguish the data underlying the characterization with the characterization itself.  As IBM explains, claim 8 recites that "characterizations for respective users [are] based on the compiled data."  Patent '849 at 40:29-31.  To reflect this distinction, IBM appropriately looks to a portion of the specification that describes "targeting criteria" based on the user's data and then, in a sentence beginning "[s]tated otherwise," refers to "characterizations of the respective users."  <u>Id.</u> at 10:8-27.

For these reasons, the Court adopts the following modified version of IBM's proposed construction: "**targeting criteria for users as defined by interaction history with the service and/or such other information as user demographics and locale.**"

**B. Claim Constructions for Patent '414**

The claim construction issues raised by the parties relate to two claims of Patent '414, claim 1 and claim 3, which is itself dependent on claim 1.  Claim 1 states as follows:

> **Claim 1:**   A method for formatting and serving web content, the method performed by a processor comprising: requesting a set of JavaScript objects and a set of JavaScript functions in a single Hypertext Transfer Protocol (HTTP) request; and in response to the

> requesting: obtaining the set of JavaScript objects that
> represents dynamic JavaScript data; and obtaining the
> set of JavaScript functions to format the set of
> JavaScript objects, the set of JavaScript objects being
> distinct from the set of JavaScript functions; and
> formatting the set of JavaScript objects using the set
> of JavaScript functions as a parameter; and outputting
> at least a subset of the set of JavaScript objects in a
> format determined by the set of JavaScript functions.

The parties dispute the construction of various terms in claims 1 and 3. In addition, Chewy argues that claim 1 – and, by extension, claim 3 – is indefinite because the claim step "formatting the set of JavaScript objects using the set of JavaScript functions as a parameter" is nonsensical as written. IBM, in response, argues that the term is not indefinite and should be read with the addition of commas as: "formatting the set of JavaScript objects, using the set of JavaScript functions, as a parameter."

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014). "In evaluating a claim for indefiniteness, courts must be mindful of the 'inherent limitations of language,' and understand that '[s]ome modicum of uncertainty . . . is the price of ensuring the appropriate incentives for innovation.'" Roche Diagnostics GMBH v. Enzo Biochem, Inc., 2017 WL 6988709, at *3 (S.D.N.Y. Oct.

2, 2017) (quoting Nautilus, 572 U.S. at 909).  Additionally,
because "issued patents are presumptively valid, a party seeking
to invalidate a claim as indefinite must do so by clear and
convincing evidence."  Id. (citing Microsoft Corp. v. i4i Ltd.
P'ship, 564 U S. 91, 102-05 (2011)).

   Chewy argues that the claim is naturally read as stating that
"formatting the set of JavaScript objects" is performed by "using
the set of JavaScript functions as a parameter."  This, however,
would be understood as nonsensical to a skilled artisan, who would
understand that JavaScript objects are used as parameters — that
is, inputs — for JavaScript functions, not the other way around.
See Almeroth Decl. ¶ 93.  As written, this claim step requests the
equivalent of "toasting bread using the toaster as an input."  Id.
Because such a step is nonsensical, the claim — Chewy argues —
must be indefinite.  See Trustees of Columbia Univ. in City of New
York v. Symantec Corp., 811 F.3d 1359, 1367 (Fed. Cir. 2016) ("The
claims are nonsensical in the way a claim to extracting orange
juice from apples would be, and are thus indefinite.").

   IBM responds that the claim is not indefinite when read in
light of the specification.  As IBM notes, in multiple places the
specification makes clear that "a set of JavaScript functions can
be created that takes the set of JavaScript objects as a parameter,
and outputs all or a subset of this data object in a format
determined by this JavaScript function."  Patent '414 at Abstract;

22

1:58-62; 2:4-7; 3:59-62).   Thus, IBM asserts, when read in combination with the specification, it is apparent that the claim language restates this idea.   In particular, IBM argues that the claim step should be read with commas added, such that "using the set of Javascript function" is simply a clause explaining how "formatting the set of JavaScript objects occurs."   IBM suggests that this reading is further supported by testimony of one of the named inventors and Chewy's expert, both of whom stated that a skilled artisan would understand that the objects are treated as the parameters, not the functions.   ECF No. 73-4 at 133:10-15; Almeroth Decl. ¶ 93.

Chewy, in turn, argues that IBM is essentially asking for judicial correction of the claim — a doctrine which requires a showing, among other things, that the correction is not subject to reasonable debate.   See Novo Industries, L.P. v. Micro Molds Corp., 350 F.3d 1348, 1354 (Fed. Cir. 2003).   For its part, IBM disclaims seeking judicial correction, IBM OB at 15 ("IBM never claimed that the patent requires judicial correction"), arguing instead that it is merely explaining where in the sentence one should pause and offering a construction that aligns with that offered by one of the inventors.   See ECF No. 73-4 at 133:10-15 ("I think it says, '[f]ormatting the set of JavaScript objects,' pause, 'using the set of functions,' pause, 'as a parameter.'").

In the Court's view, IBM offers convincing evidence that a skilled artisan would understand that it is the set of objects, rather than the set of functions that are to serve as the parameters. But even accepting IBM's construction, the claim step is still nonsensical. Under IBM's construction, "using the set of JavaScript functions" is construed as a dependent clause, which, when removed renders the claim step as "formatting the set of JavaScript objects as a parameter." But obviously, the set of objects are not to be formatted <u>as</u> a parameter. Thus, even as construed, the language does not make sense.

Here, the Federal Circuit's decision in <u>Allen Engineering Corp. v. Bartelli Industries, Inc.</u>, 299 F.3d 1336, 1349 (Fed. Cir. 2002), offers guidance. In that case, the claims recited a steering box that pivoted "its gear box only in a plane perpendicular to [a] biaxial plain." <u>Id.</u> As the court recognized, a skilled artisan would know that such pivoting was impossible; moreover, it was clear from the specification that the patentee's invention required pivoting in "parallel" rather than "perpendicular" planes. <u>Id.</u> Although the patentee argued that claims were valid because a skilled artisan "would understand that the term 'perpendicular' in the claim should be read to mean 'parallel,'" the court held that claims to be indefinite, explaining that it is not the court's "function to rewrite claims to preserve their validity." <u>Id.</u>

Similarly, here, it does not appear to be possible to read the term sensibly without rewriting it to correct the apparent error.  While this claim may be candidate for judicial correction, in light of IBM's explicit disclaimer of that doctrine the Court holds that the claim is indefinite. Because the Court finds that claim 1 is indefinite, it does not address the parties' arguments as to the construction of the other disputed terms for Patent '414, all of which relate to claim 1, either directly or through dependent claim 3.

**C.   Claim Constructions for Patent '443**

The claim construction issues discussed in this section relate to the following two independent claims of the '443 patent, in addition to certain dependent claims:

> **Claim 1:**  A method of targeting at least one associated advertisement from an Internet search having access to an information repository by a user, comprising: identifying at least one search result item from a search result of said Internet search by said user; searching for said at least one associated advertisement within said repository using said at least one search result item; identifying said at least one associated advertisement from said repository having at least one word that matches said at least one search result item; and correlating said at least one associated advertisement with said at least one search result item.

> **Claim 15:**  A method for providing related advertisements for search result items from a search of an information repository, comprising: matching said search result items to said related advertisements; designating each of said search result items that have said related advertisements matched therewith; providing a corresponding graphical user interface for each of said search result items so designated for subsequent user

25

selection;  searching  and  retrieving  said  related
advertisements for one of said search result items when
said corresponding graphical user interface is selected
by a user; and formatting and displaying said related
advertisements upon selection.

1. **"associated advertisement"** (claims 1, 2, 5, 10, 13, 14),
   **"related advertisement(s)"** (claims 15, 17), **"related
   product advertisement(s)"** (claim 17)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary] | Indefinite |

Chewy  argues  that  the  terms  "associated  advertisement,"
"related advertisement(s)," and "related product advertisement(s)"
are indefinite because the patent fails to explain what each term
means and/or how they are different from each other.  In support,
Chewy relies on the declaration of its expert, who states that,
"[w]hile these terms are sometimes understood at a very broad
level, the specification does not provide sufficient guidance for
a [skilled artisan] to reasonably understand the scope of the
terms."  ¶ 107.  For example, pointing to claim 1, which involves
"searching for said at least one associated advertisement within
said repository using said at least one search result item,"
Chewy's expert explains that the patent "gives no instruction how
to do that or even how to determine if a given advertisement in
the 'repository' is an 'associated advertisement.'"  Id. ¶ 108.
Similarly, in connection to claim 15, which is directed to "a
method for providing related advertisements for search result

26

items," the expert states that the claim never defines what is a "related advertisement" and instead "assumes that 'related advertisement[s]' are already in existence and, therefore, can be matched to the 'search result items.'" Id. ¶ 110.

IBM responds that the terms "associated" and "related" are not technical terms, but rather common words that would be clear to a jury, let alone a skilled artisan.   In support of its contention that "related" is used in the ordinary way, IBM points to the background of the invention, which states that "[t]he instant invention provides a new method and apparatus for associating search result items with similar or related advertisements," Patent '443 at 1:63-64, thus showing that the term "related" is used to mean "similar."  With regard to the term "related product advertisement(s)," which appears in dependent claims 9 and 17, IBM argues that there is no ambiguity because the dependent claims narrow the independent claims: "[c]laim 9 requires that the 'associated advertisement' (i.e., the advertisement that is associated/linked/connected) be a 'related product advertisement' (i.e., that of a similar product)" and "[c]laim 17 requires that the 'related advertisements,' be 'related product advertisements.'"  IBM RB at 18.

The key question in determining definiteness is whether a skilled artisan will be able to understand the "the scope of the invention."  Nautilus, 572 U.S. at 901.  Here, the terms, when

27

read in light of the patent as a whole, are sufficiently clear to communicate the scope of the patent — namely, that it is a method for determining which advertisements to show the user based on what advertisements are related to the results of the search, rather than advertisements related to the search queries themselves or based on a user profile.  Thus, although words like "related" and "associated" may nonetheless be vague on their own, the specification provides a conceptual baseline that is sufficient to overcome the charge of indefiniteness.  See Neev v. Alcon Lab'ys, Inc., 2016 WL 9051170, at *4 (C.D. Cal. Dec. 22, 2016) ("But for a term of degree, absolute or mathematical precision is unnecessary."), aff'd sub nom. Neev v. Alcon Lensx Inc, 774 F. App'x 680 (Fed. Cir. 2019).

That said, as Chewy's expert notes, the patent fails to specify the method by which the relatedness of advertisements is to be determined, among other technical details.  However, while such an issue may ultimately provide a basis for a validity challenge, the claims would not fail for indefiniteness on this basis.  See Amgen Inc. v. Sandoz Inc., 2016 WL 4137563, at *5 (N.D. Cal. Aug. 4, 2016) (Seeborg, J.) ("[T]he lack of precision in the claim and specification impacts only his or her ability to practice all embodiments of the claim — a question of enablement, not indefiniteness."), aff'd, 923 F.3d 1023 (Fed. Cir. 2019).

Accordingly, the Court holds that no construction is necessary and the terms are not indefinite.

### 2. "Internet search" (claim 1)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary] | search through an Internet search engine, e.g. google.com or yahoo.com |

The party's dispute regarding this term relates to whether "Internet search" refers only to a search through an Internet search engine — such as, google.com or yahoo.com — or whether it also extends to searches of a particular website conducted by utilizing the search bar on that website's page. In support of its contention that the term "Internet search" refers only to general internet searches, as opposed to searches of a single website, Chewy points to the language of the specification stating that a user will enter a query "to initiate a search on an Internet search engine, e.g. yahoo.com or ibm.com/java." Patent '443 at 4:52-66 (emphasis added); see also id. at 5:22-33 ("For an Internet search, this search engine may be one of many existing types, such as yahoo.com, ibm.com/java, and the like."). Both yahoo.com and ibm.com/java refer to general search engines. See ECF 87-1 ("Emens Tr.") at 41:24-43:5 (explaining that IBM.com/java hosted a search engine "dedicated to providing the ability to perform searched on Java-related items" across the Internet). In further support of

its construction, Chewy cites the testimony of the lead inventor of the patent, who testified at deposition that the "Internet search" is performed via a general Internet search engine, <u>see id.</u> at 41:24-43:5, and the declaration of its expert, <u>see</u> Almeroth Decl. ¶ 118.  Chewy also points to the part of the specification stating that the patent is directed to "Internet Search Engine Technology."  <u>See</u> Patent '443 at 1:10-12.

IBM responds primarily by arguing that the language of the specification relied upon by Chewy is drawn from the preferred embodiments and thus improperly invites the Court to import limitations from the preferred embodiments into the claims.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1323. ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").  IBM also argues that the substitution of google.com for ibm.com/java is inappropriate because the latter is a specific search of IBM content, while Google searches everything across the Internet.[2]

While it is true that it is generally "improper to read limitations from a preferred embodiment description in the

---

[2] IBM also seeks to rely on testimony from an expert in an <u>inter partes</u> review proceeding Chewy purportedly seeks to join.  The testimony, however, does not address the particular question at issue here and thus does not support IBM's broader reading of this term.  <u>See</u> IBM RB at 21.

specification . . . into the claims absent a clear indication in the intrinsic record," Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 913 (Fed. Cir. 2004), Chewy's proposal does not constitute such a limitation.   Read in the context of the specification, the examples provided in the embodiment reflect that the patentee understood an Internet search to refer to a search of the Internet as a whole, rather than a particular website.   As such, constructing the term to include exemplary language that clarifies its meaning is appropriate.   Further, the substitution of google.com for ibm.com/java is appropriate in order to make the example one that will be familiar to jurors.

Accordingly, the Court adopts the construction proposed by Chewy, that is, **"search through an Internet search engine, e.g. google.com or yahoo.com."**

**3. "correlating said at least one associated advertisement with said at least one search result item" (claim 1)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary, or alternatively]<br><br>"displaying said at least one associated advertisement together with said at least one search result item." | indefinite |

Chewy argues that the claim phrase "correlating said at least one associated advertisement with said at least one search result" is indefinite because the term "correlating" is not defined in the

patent claims or specification.  IBM disagrees, arguing that "correlating" is not a technical term but rather a common term that, in this context, refers to establishing a nexus between the associated advertisement and the search result item. Specifically, IBM argues that correlating is the result of "identifying at least one search result item," "searching," and "identifying at least one associated advertisement" that matches the "search result item."  See Patent '443, Claim 1.  In the alternative, IBM argues that "correlating" can be construed as "displaying . . . together."

In support of its argument for indefiniteness, Chewy notes that "correlating" appears in only two places in the specification — neither of which explains what it means to "correlat[e]" an associated advertisement with a "search result item."  Chewy also points to the testimony of the lead inventor who, at his deposition, stated that he could not say if there were any difference between "correlating" and "matching" advertisements with search result items.  Emens Tr. at 50:21-51:22, 52:18-53:13. Moreover, Chewy argues that IBM fails to offer any support in the specification that "correlating" refers to a "nexus" between advertisements and search result items.

In response, IBM argues that the specification explains how the correlating step occurs in the context of the preferred embodiments, where the specification describes a process of

displaying the search results with any associated products that were determined to be related.  See Patent '443 at 7:11-7:17.

Ultimately, the plain meaning of the term is sufficient to overcome the challenge to indefiniteness.  As defined by Merriam-Webster, "to correlate" is, among other things, "to present or set forth as to show relationship."   "Correlate," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/correlating?src=search-dict-hed   (last visited October 22, 2021).  When read in the context of the claim, it is clear that this is precisely the meaning intended by the patent: once the advertisement is found to be related to a search result, the correlating step refers to presenting that relationship.  That said, whether so abstract a concept as is described by this claim can survive the inquiry set out in Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217-18 (2014), is another question not currently before the Court.

Accordingly, the Court holds that the term requires no construction and is not indefinite.

### 4. "providing said at least one associated advertisement on demand by said user" / "on demand by said user" (claim 2)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| "on demand by said user": upon the user selecting a graphical user interface to investigate related advertisements | indefinite |

IBM argues that its construction of this term comes directly from the specification.  In a paragraph that is introduced as "[t]he method of the instant invention," the specification states that "once . . . advertisements are acquired, they may be viewed by the user on demand."  Patent '443 at 4:60-61.  The specification then explains that "on demand" means that "[f]or each search result item, a graphical user interface (GUI) selection is presented, allowing the user to select the GUI, on demand if so desired, to investigate related advertisements."  Id. at 4:67-5:3.  Putting this together, the patent then equates "on demand" with "the user selecting a graphical user interface" so as "to investigate related advertisements."  This, IBM argues, reflects that "on demand" means when the user selects a GUI.

This interpretation, however, fails as a matter of claim differentiation.  As Chewy notes, dependent claim 7, like claim 2, depends on claim 1, and specifically recites the step of "displaying a graphical user interface to [the] user."  IBM's construction of claim 2, however, reads "on demand by user" as implying the display of a GUI.  Thus, IBM's construction improperly reads into the term "on demand by user" a restriction that is made explicit in another claim that is also dependent on the same independent claim that claim 2 depends on.  See Kara Tech. Inc. v. Stamps.com Inc., 582 F.3d 1341, 1347 (Fed. Cir. 2009) ("when the inventor wanted to restrict the claims . . .  he did so

explicitly"). Because IBM has offered no construction that renders this term meaningful without encroaching on the explicit language of another claim, the Court holds that claim 2 is indefinite.

### 5. "a user identifier" / "assigning a user identifier" / "an identifier for said user" (claims 10, 16)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| "user identifier": session value that is used to associate user queries to search result item selections | indefinite |

Although the term "user identifier" does not appear in the specification, IBM's construction derives from the use of the similar term "user session identifiers." According to the specification, "user profiles are used to determine the appropriate advertis[ing]." Patent '443 at 1:38-40. However, user profiling provides several challenges, including that "it is [] difficult to identify a specific user, i.e., a user interested in purchasing automobiles, and associate the correct advertisement profile to the user." Id. at 1:46-56. The invention claims to solve this problem by identifying users with their sessions, referred to as the "user session identifiers." As the specification explains: "Each user performing a query is assigned a user session identifier. This session identifier is used to associate user queries to search result items selections, i.e., product selections." Id. at 6:24-27. Reading the claim in the

context of the specification thus suggests that understanding
"user identifiers" to refer to these session values.  See Cox
Commc'ns, 838 F.3d at 1231 (the specification "inform[s] . . .
those skilled in the art about the scope of the invention").

In support of its contention that the claim terms are
indefinite, Chewy relies on two pieces of evidence.  First, it
cites its expert's conclusory assertion that the term is
indefinite.  See Almeroth ¶ 134 ("the term 'user identifier' is
very broad and the specification does not provide sufficient
guidance for a POSITA to understand the scope of the term").
"However, conclusory, unsupported assertions by experts as to the
definition of a claim term are not useful to a court."  Phillips,
415 F.3d at 1318.  Second, Chewy points to testimony of the main
inventor in which he, at his deposition, stated his belief that
"user ID . . . is different from a user session, where a session
ID is initiated without knowledge of the user themselves or their
profile or a profile."  Emens Tr. at 153:9-17.  But placed in
context, it is far from clear that the inventor understood the
phrase "user ID" as posed to him in the deposition to refer to the
"user identifier" as specifically used in the specification.
Indeed, it appears the inventor may have reasonably understood the
questioner to be using the phrase "user ID" to refer to what the
inventor had previously referred to as a "user profile."  See id.
at 96:2-4.  As such, this testimony is inconclusive at best in

terms of showing a difference between a "user identifier" and a "user session identifier," as used in the claim and specification, respectively.   Chewy has thus failed to meet its burden to establish this term's indefiniteness.

Accordingly, the Court rejects Chewy's indefiniteness contention and adopts IBM's construction, to wit, **"session value that is used to associate user queries to search result item selections."**

**6.   "matching said search result items to said related advertisements" (claim 15)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary or alternatively,]<br><br>identifying said related advertisements from said information repository having a word that matches a keyword from said search result items | analyzing a search result item for at least one keyword and identifying an advertisement from the repository having a word that matches that keyword |

The parties' primary dispute is whether the Court should construct the claim term to include a step of "analyzing."   In support of including an "analyzing" step in the construction, Chewy relies primarily on the description of "[t]he associating step" that appears in one of the "aspects" of the preferred embodiment. Patent '443 at 2:32-39.   Specifically, the patent explains that:

> The associating step of this program storage device further comprises: analyzing the search result to produce at least one keyword; using the keyword to search for the associated advertisement within the repository;

> identifying the associated advertisement from the repository having a word that matches the keyword as related to the search result; and[] correlating the associated advertisement with the search result.

Id. Although acknowledging that this description of the matching process appears in an embodiment, Chewy argues that because "it is the only embodiment disclosed in the patent," it nevertheless "constitutes the proper construction of that claim." Chewy OB at 22. Additionally, Chewy cites testimony of the lead named inventor on the patent, which Chewy characterizes as stating that "matching" includes analyzing. See Chewy RB at 20.

On both of these points, Chewy overstates the evidence. First, while it is true that the specification only describes a single preferred embodiment, the Federal Circuit as "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as limited to that embodiment." Phillips, 415 F.3d at 1323; see also Warsaw Orthopedic, Inc. v. Globus Med., Inc., 416 F. App'x 67, 69 (Fed. Cir. 2011) (rejecting construction limiting the claim to the single preferred embodiment where "'the Summary of the Invention' describes various 'aspects' of the invention"). Second, though the inventor acknowledged overlap between the "matching" and "associating" steps, the cited portions of his deposition testimony merely reflect his belief that "matching," like "associating," involves "correlating the associated advertisement

38

with the search result" – not necessarily that "matching" involves a separate "analyzing" step.  See Emens Tr. at 48:9-24 54:6-1, 124:21-125:10.[3]

IBM, on the other hand, offers a construction that equates the matching step in independent claim 15 with the identifying step in independent claim 1.[4]  This construction reflects what both parties essentially concede, that is – that claim 15's matching step refers to the same process of matching a word from the related advertisements with a keyword from the search result item that is set out in claim 1.  Compare Patent '443, claim 1, with id., claim 15.  Moreover, IBM's construction captures this parallel without the addition of an additional step is not expressly stated in claim

_____

[3] Chewy also argues IBM disavowed the claim scope during prosecution when the applicant referred to Figure 1, which illustrates the preferred embodiment, in seeking to overcome the cited prior art.  But as IBM explains, the applicant referred to this figure to explain that the invention identifies advertisements from the search result, rather that the initial search query as recited by the prior art referenced, not in order to limit the scope of the claim to include a separate analyzing step.  See ECF 69-18 at 12 ("Importantly, [the prior art] teaches deriving product data from an initial search argument, and determining a logical fit to the initial search argument.  The present invention discloses, teaches, and claims identifying associated advertisement from the search result, not the search argument."); see also Baxalta Inc. v. Genentech, Inc., 972 F.3d 1341, 1348 (Fed. Cir. 2020) ("in order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable")

[4] Although IBM, in the first instance, argues that no construction is necessary, it fails to offer any argument in support of this position and thus effectively concedes that construction is appropriate.

1.  Finally, IBM's construction – unlike Chewy's construction – does not eliminate references back to the preamble (through the replacement of the words "said" with the articles "an"), nor does it unnecessarily change the plural "search result items" and "advertisements" into the singular.  As such, IBM's construction hews closer to the language of the specification.

Accordingly, the Court adopts IBM's construction of this term, to wit, **"identifying said related advertisements from said information repository having a word that matches a keyword from said search result items."**

### D. Claim Constructions for Patent '034

The claim construction issues discussed in this section relate to the following four independent claims of Patent '034, as well as a number of dependent claims:

> **Claim 1:**  A method in a data processing system for presenting a set of objects on a display within the data processing system, the method comprising: responsive to detecting movement of a pointer over an object within the set of objects, identifying an object for the object, wherein the object type is one of a plurality of object types, and wherein more than one object in the set of objects may have a same object type; and magnifying presentation of the object based on the object type of the object.

> **Claim 11:**  A method in a data processing system for presenting information, the method comprising: monitoring for a change in focus on the information from a first portion of the information to a second portion of the information; identifying a context of the second portion of the information, wherein the context is one of a plurality of contexts, and wherein more than one portion of information may have a same context; and

magnifying presentation of the information based on the
context of the second portion of the information.

**Claim 29:**  A data processing system for presenting a set
of objects on a display within the data processing system
comprising: identifying means, responsive to detecting
movement of a pointer over an object within the set of
objects, for identifying an object type for the object,
wherein the object type is one of a plurality of object
types, and wherein more than one object in the set of
objects may have a same object type; and magnifying means
for magnifying presentation of the object based on the
object type of the object.

**Claim 39:**   A data processing system for presenting
information comprising: monitoring means for monitoring
for a change in focus on the information from a first
portion of the information to a second portion of the
information; identifying means for identifying a context
of the second portion of the information second, wherein
the context is one of a plurality of contexts, and
wherein more than one portion of information may have a
same context; and magnifying means for magnifying
presentation of the information based on the context of
the second portion of the information.

**1. "object type(s)" (claims 1, 8, 29)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary] | type(s) of object(s) (e.g., a graphic object, image object, video object, text object, or audio object) |

"[A] court may not simply rely on the 'ordinary' meaning of

a term if that ordinary meaning does not resolve the parties'

dispute." Simo Holdings Inc. v. Hong Kong Ucloudlink Network Tech.

Ltd., 346 F. Supp. 3d 598, 602 (S.D.N.Y. 2018).  IBM argues that

no construction is needed because the term "object type(s)" is

41

readily understood.  But as Chewy explains in its brief, construction is required in order to resolve the parties dispute as to whether, for example, various images can be considered different object types because they differ in terms of a certain attribute in the source code.  See Chewy OB 25-26.

Chewy's proposed construction primarily seeks to provide meaning by offering examples of the sort of different types of objects contemplated by the patent.  See, e.g., Simo Holdings, 346 F. Supp. 3d at 609 (construing term to include examples); IPXL Holdings, L.L.C. v. Amazon.com, Inc., 333 F. Supp. 2d 513, 524 (E.D. Va. 2004) (same).  Specifically, the proposed construction adopts a list of examples consistent with the examples provided of object types in the specification itself.  See Patent '034 at 4:57-59 ("object type" is "for example, a text object, an image object, and an audio object"); id. at 5:66-67 ("Each object is magnified based on its object type, such as text or image.").

IBM raises two main points in response.  The first is that it is inappropriate to limit the scope based on embodiment examples, particularly where the language used is expressly exemplary in nature.  The second is that the construction is inconsistent with the narrower claim 2, which recites "The method of claim 1, wherein the object type is one of a graphic object, image object, video object, text object and an audio object."

Chewy's proposed construction, however, both is true to the specification and helpfully clarifies how the term would be understood in the relevant context.  Contrary to IBM's position, the construction does not inappropriately limit the "object types" to those exemplary types but rather integrates those helpful examples from the specification into the claim.  Nor does it create conflict with claim 2, because the construction makes clear the terms are only examples, thus contemplating that some object types may be covered that extend beyond the scope to which claim 2 is explicitly limited.

Accordingly, the Court adopts Chewy's proposed construction, to wit, **"type(s) of object(s) (e.g., a graphic object, image object, video object, text object, or audio object)."**

**2. "context(s)" (claims 11, 18, 20, 39, 46)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| way(s) in which information is being presented in a data processing system | object information type(s) (e.g., textual information, graphic information, image information, video information, or audio information) |

The parties dispute regarding the construction of this term is largely duplicative of their dispute regarding "object type(s)."  Seeking a broad construction, IBM relies on a passage of the specification stating that "these[] different object types are examples of different contexts for information being presented

in the data processing system." Patent '034 at 4:59-61. IBM argues that this sentence speaks to the fact that context may include "object types" but is also broader, including other "information being presented." Id. 4:59-61.

Chewy, on the other hand, argues that the specification uses the terms "object type(s)" and "context(s)" interchangeably, and thus proposes a construction that reflects as much. In support, Chewy cites various portions of the specification. See, e.g., id. at 4:54-57 ("The present invention provides a method, apparatus, and computer implemented instructions for magnifying objects presented in a data processing system based on the context of the objects."); id. at 10:29-33 ("[T]he context takes the form of text objects, image objects, and audio objects. Of course, the mechanism of the present invention may be applied to other types of context, such as, for example, a video object, and a graphic object."); id. at 6:19-23 ("[P]references may be set for context having object types of a text object, an image object, and an audio object."); id. at 7:19-24 ("[I]f the context is a text object, the object is magnified by changing the font size and/or font type of the text within the text object. If the object is an audio object, the object may be magnified by increasing the volume at which the audio object is presented.")

"Although there is a presumption that different words used in patent claims do carry distinct meanings, it is only a presumption

and a presumption may be overcome." <u>Helmsderfer v. Bobrick Washroom Equip., Inc.</u>, 2007 WL 2407048, at *9 (S.D. Ohio Aug. 20, 2007), <u>aff'd</u>, 527 F.3d 1379 (Fed. Cir. 2008). Based on the way the way in which "context(s)" is used in the specification, it appears that Chewy's construction is truer to how the term as used here would be understood by a skilled artisan.

As such, the Court adopts Chewy's proposed construction, to wit, **"object information type(s) (e.g., textual information, graphic information, image information, video information, or audio information)."**

### 3. "magnifying the information is performed selectively such that only a selected context is magnified" (claim 20)

| IBM's Proposal | Chewy's Proposal |
|---|---|
| [no construction necessary] | [indefinite] |

Chewy argues that "neither Patent '034 claims nor the specification provide sufficient guidance as to what 'a selected context' is or how a context is selected for magnification." Chewy OB at 27. In contrast, IBM argues that the claim term uses common words, rather than terms of art that need construction, and that, relying on the ordinary meanings of the terms, the claim language at issue is clear about the scope of the invention. In particular, IBM points to a passage from the specification that explains how

selection operates using a text magnification example.  The passage states, in full:

> In these examples, the font size is larger than the original font size for text 302.  In this example, a preference has been set such that an object is defined to be a word.  Text 302 has an object type of text object in these examples.  <u>Of course, other settings may be selected in which the object is, for example, a group of words, a sentence, a line, a part of a line, or a paragraph.</u>  In this example, a group of words may be words adjacent to the selected word or some number of words based on a user preference.  <u>With respect to the amount of text that is selected to be an object, this text may be defined in a number of ways including using text delineation tags, such as, for example, hypertext markup language (HTML) codes in a browser</u>.

Patent '034 at 5:24-36 (emphasis added).  As IBM notes, this passage describes how to selectively group information together so that just the desired content will be magnified, whether it comprises a word, sentence, or paragraph.  This comports with the ordinary meaning of the word "to select," that is, "to choose from a number or group" or "pick out."  See "Select," <u>Merriam-Webster Online                Dictionary</u>,                https://www.merriam-webster.com/dictionary/select (last visited October 26, 2021).

Chewy responds that the cited passage describes the process for creating a text object, not the processes for defining a selected context.  But, as discussed above and as Chewy itself advocated, "context" is used interchangeably with "object" by the patent — and here the process for creating a text object is an act

of defining the selected context.  See Patent '034 at 5:32-33

(discussing "the amount of text that is selected to be an object").[5]

Accordingly, the Court holds that no construction is

necessary and that Chewy has not met its burden to establish that

the claim term is indefinite.

### 4. The "identifying means" terms (claims 29, 39)

| Term | IBM's Proposal | Chewy's Proposal |
|---|---|---|
| "identifying means . . . for identifying an object type for the object" (claim 29) | Function: identifying an object type for the object<br><br>Structure: a computer system with program code for detecting pointer movement over a new object to magnify and determining the object type of the object<br><br>See Fig. 6 and accompanying text | Function: identifying an object type for the object<br><br>Structure: no corresponding structure (indefinite) |
| "identifying means for identifying a context of the second portion of the information second" (claim 39) | Function: identifying a context of the second portion of the information<br><br>Structure: a computer system with program code for | Function: identifying a context of the second portion of the information<br><br>Structure: no corresponding |

---

[5]    Chewy also cites conclusory statements from its expert's
declaration, which IBM seeks to challenge in part by contrasting
the statements of Chewy's expert in this proceeding with
testimony in the inter partes review proceeding regarding this
patent.  Because no weight is accorded to conclusory statements
of an expert, the Court need not address these arguments.

| | detecting pointer movement over a new portion of information to magnify and determining the context of the portion of information<br><br>See Fig. 6 and accompanying text | structure (indefinite) |
|---|---|---|

The parties agree that these phrases are means-plus-function phrases.  Under 35 U.S.C. § 112(f) (formerly § 112, ¶ 6), means-plus-function claiming occurs when an element in a claim is a "means or step for performing a specified function without the recital of structure, material, or acts in support thereof . . . ."  The "claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  Id.  "The construction of a means-plus-function limitation follows a two-step approach."  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1321 (Fed. Cir. 2003).  The first step requires identifying the function, "staying true to the claim language and the limitations expressly recited by the claims."  Id.  The second step is "ascertain[ing] the corresponding structures in the written description that perform those functions."  Id.

Here, the parties agree on the claimed function, but disagree on the structure that performs that function.  "In cases involving

48

a computer-implemented invention in which the inventor has invoked means-plus-function claiming," the structure disclosed in the specification must be "more than simply a general purposes computer." Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008). Rather, such inventions "require disclosure of an algorithm." EON Corp. IP Holdings LLC v. AT&T Mobility LLC, 785 F.3d 616, 623 (Fed. Cir. 2015). But, importantly, the algorithm need not be actual computer code. Rather, all that is required is a step-by-step procedure for accomplishing a given result." Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1385 (Fed. Cir. 2011). This can be expressed "in any understandable terms including as a mathematical formula, in prose, . . . or as a flow chart, or in any other manner that provides sufficient structure." Finisar Corp. v. DirecTV Grp., 523 F.3d 1323, 1340 (Fed. Cir. 2008).

IBM argues that the specification sufficiently outlines the corresponding structure through Figure 6 and the accompanying text, which provide the structure for detecting cursor or pointer movement over a new object to magnify and determining the object type of the object:



Patent '034, Fig. 6.  This process is described in words in the specification with reference to the flow chart. Id. at 7:32-36, 42-45, 52-55, 61-65.  Because this flowchart and accompanying text describes in simple steps how to monitor for a change in focus, IBM argues that the term is not indefinite.

Chewy argues that the flowchart in Figure 6 is merely a visual construct describing the process flow of the claim function itself, which is insufficient to provide the corresponding structure.  In support, it likens this case to In re Aoyama, 656 F.3d 1293, 1298 (Fed. Cir. 2011), where the Federal Circuit held that a figure that provided only "a high level of process flow" failed to disclose an algorithm sufficiently.  As the court in Aoyama explained, the flowchart in dispute there simply "present[ed]

50

several results to be obtained, without describing how to achieve those results."  Id.  Figure 6 is comparable, Chewy argues, in that it provides different examples of results from identifying the nature of the object — that is, steps "OBJECT IS TEXT?" (602), "OBJECT IS IMAGE?" (606) and "OBJECT IS AUDIO?" (610) — without explaining in any detail how to identify if the object is an image or text or audio.

The Court agrees.  Because the flowchart and accompanying text fail to provide even a high-level description of the steps for identifying the object type or context, the specification does not adequately disclose an algorithm.  Accordingly, the Court finds that claims 29 and 39 are indefinite.  Because the Court finds these terms indefinite, it does not address the other disputed claim constructions relating only to these claims or their dependent claims.

**E. Claim Constructions for Patent '831**

The claim construction issues discussed in this section relate to claim 1 of Patent '831, as well as five dependent claims:

> **Claim 1:**  A computer implemented method in a computer system for presenting a page, the method comprising: receiving a page; rendering the received page on a virtual display to form a rendered page; determining whether the rendered page falls within a proximity policy; responsive to determining that the rendered page does not fall within the proximity policy, reformatting the rendered page on the virtual display to fall within the proximity policy to form a reformatted page, wherein the proximity policy defines a minimal spacing between

51

links of a plurality of links within the page; and presenting the reformatted page to a user.

**1. "virtual display" (claim 1)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| a web browser unit where webpage content is projected by the server for display based on processed language interpretation | a display onto which the page is projected prior to displaying it to the user |

The primary dispute here is whether the "virtual display" should be construed broadly to cover the actual display presented to the user via the user's web browser (as IBM contends), or whether it should be limited to a display onto which the page is projected "prior to displaying it to the user" and not itself ever made visible to the user (as Chewy contends).

Chewy argues that its construction is consistent with the claim language and the specification. Claim 1 recites the following steps: (1) "rendering the received page on a virtual display to form a rendered page"; (2) if the rendered page does not fall within the proximity policy, "reformatting the rendered page on the virtual display to fall within the proximity policy to form a reformatted page," and then (3) "presenting the reformatted page to a user." Chewy argues that these steps make clear that the received page and reformatted page are rendered, i.e., projected, on the "virtual display" prior to "presenting the reformatted page to a user."

52

In further support of this interpretation, Chewy cites two pieces of intrinsic evidence.  The first is the language from the introduction of the specification stating that "the present invention provides a method and system for uncluttering and reformatting a web page <u>before presenting the web page to a user.</u>"  Patent '831 at 1:8-10 (emphasis added).  Generally, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  <u>Regents of the Univ. of Minn. v. AGA Med. Corp.</u>, 717 F.3d 929, 936 (Fed. Cir. 2013).  As such, this is strong evidence of meaning.  Second is the specification's diagrams, including Figure 6, which shows the "user" (610) only interacting with "the web browser" (606) and not the "virtual display" (608):



FIG. 6

53

See Patent '831 at Fig. 6.  Similarly, Figure 8 depicts the browser rendering the document on the virtual display as a step prior to the browser rendering the "document page," presumably to the user:



Id. at Fig. 8.

54

First, with regard to the language of claim 1, IBM argues that the fact that the last method step is "presenting the reformatted page to a user" does not necessarily imply that the first time the user sees any rendered page is when they are presented the "reformatted page." Further, the patent teaches a preferred embodiment where the virtual display (608) "<u>may</u> be internal to web browser 606 and <u>not visible to user 610</u>." <u>Id.</u> at 7:53-57 (emphasis added). IBM argues that the use of the word "may" indicates that the virtual display need not be invisible.

Second, IBM cites two pieces of extrinsic evidence: deposition testimony of Chewy's expert in which — according to IBM — the expert concedes that that a virtual display need not be "invisible or visible," IBM RB at 36 (quoting ECF No. 73-2 at 130:15-24), and the deposition testimony of one of the named inventors, who stated that "the patent says the virtual display may not be internal," in which case "it would be visible to the user," ECF No. 73-2 at 153:17-23.

Finally, IBM argues that Chewy's proposed construction uses "display" in a contradictory manner, because it uses the word "display" to refer to something it contends is not displayed to the user.

IBM instead offers a less specific description of virtual display as a unit of the web browser that — drawing language from the specification — is "involved in presenting web pages to a user

55

based on results from language interpretation." Id. at 6:54-57. Without contesting that the virtual display is a unit of the web browser, Chewy argues that this construction fails to distinguish the "virtual display" from the "actual display" on the web browser that is ultimately seen by the user, essentially rendering the word "virtual" superfluous. See Mangosoft, Inc. v. Oracle Corp., 2004 WL 2193614, at *8 (D.N.H. Sept.21, 2004), aff'd, 525 F.3d 1327 (Fed.Cir.2008) ("To avoid rendering the word 'local' entirely superfluous (or, at best, redundant), it must be given a meaning other than 'coupled.'").

As discussed above, the intrinsic evidence strongly supports a construction in which the virtual display is a "display" internal to the browser and not shown directly to the user. The text of the specification that IBM relies on to refute this interpretation — stating that the virtual display "may" be internal and not visible to the user — in no way contradicts this interpretation, particularly because the fact that something may occur does not necessarily imply that it also may not occur.

Moreover, the extrinsic evidence cited by IBM is insufficient to overcome the intrinsic evidence. The testimony from Chewy's expert is far more ambiguous when placed in its context, as it appears that his comment that a display could be "invisible or visible" referred to displays generally and not specifically "virtual display" as used in the claim. See ECF No. 73-2 at 130:9-

56

24.   Moreover, in the quoted testimony of the inventor, the inventor was not offering his understanding of the claim, but rather purporting to report what the patent itself says — "the patent says the virtual display may not be internal." ECF 73-9 at 153:17-23.  But here the inventor misspoke, as the patent says the opposite – that is, that the virtual display may be internal.  As such, this external evidence is insufficient to overcome the weight of the intrinsic evidence from the specification.

Accordingly, the Court adopts Chewy's proposed construction, but with a modification to address the potential confusion of referring to a "display" that is not actually displayed to the user.  The construction then reads as follows: **"a web browser unit onto which the page is projected prior to displaying it to the user."**

2. **"proximity policy" (claims 1-4, 8, 9)**

| IBM's Proposal | Chewy's Proposal |
|---|---|
| policy defining spacing rules | user-defined policy specifying spacing rules for hyperlinks |

The parties' proposed constructions present two issues for determination: (1) whether the "proximity policy" must be "user-defined" and (2) whether the policy-defined spacing rules must be limited to "spacing rules for hyperlinks."  Chewy argues that both of these limitations apply, while IBM argues that neither do.

57

### a. User-defined

Chewy argues that the patent requires a user to set the criteria for the "proximity policy."  As Chewy notes, the specification describes various criteria that the user may use to define the "proximity policy," stating, for example, that "a user may determine that vertical and horizontal spacing between any two or more hyperlinks is . . . at least 15 pixels."  Patent '831 at 7:65-8:25.  The "Summary of the Invention" also clearly describes a role for the user, stating that "[t]he policy structure of the present invention allows the user to specify the appearance of the electronic document page."  Id. at 3:18-20; see also id. at 3:20-23 ("The policy structure as defined by the user is stored such that when the user returns to the page, the page may be displayed according to the policy structure defined by the user.").

Chewy also points to the prosecution history. Specifically, in the context of distinguishing the prior art, the patentee explained that, in contrast to a "protocol," "a policy is a rule or set of rules specified by a user."  ECF No. 72-9 at 11.  It continues, "[i]n the instant application a policy is a rule that allows the user to specify the appearance of an electronic document page."  Id.  This provides strong evidence supporting the construction of "proximity policy" such that it must be user-defined.  See Hockerson-Halberstadt, Inc. v. Avia Group Int'l, 222 F.3d 951, 957 (Fed. Cir. 2000) ("The prosecution history

58

constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations . . . .")

IBM, in support of its broader construction, offers three responses to Chewy's arguments. First, IBM points out that the passage from the specification cited by Chewy describing the criteria that can be used to set the proximity policy merely states that a proximity policy "may be set by a user." Patent '831 at 7:65-8:8. Because "[t]his language is permissive," IBM argues that, it is not "the type of clear language necessary to import a limitation into the claims." AbbVie Inc. v. Mylan Pharms. Inc., 2015 WL 3505094, at *3 (D. Del. June 3, 2015).

Next, IBM argues that the Chewy mischaracterizes the passage from the "Summary of the Invention," which states that "[t]he policy structure of the present invention allows the user to specify the appearance of the electronic document page." Patent '831 at 3:18-20. According to IBM, this passage relates to the "policy structure," which is distinct from the "proximity policy." However, IBM offers no explanation for what "policy structure" refers to if not the proximity policy. Instead, IBM characterizes the paragraph of the "Summary of the Invention" in which the phrase "policy structure" appears as describing an "unclaimed concept" that is distinct from a proximity policy. IBM RB at 38.

Finally, IBM argues that Chewy's construction would render claim 11, which depends on claim 1, superfluous because claim 11 adds to claim 1 the requirement of "modifying the proximity policy according to a user preference" — an addition that would accomplish no further limitation if "proximity policy" was already defined to mean that it was user-defined.

While IBM's arguments are not without some import, the Court is persuaded that Chewy's construction is ultimately the correct one.  "[L]anguage appear[ing] in both the Abstract and the Summary of the Invention, . . . sections meant to describe the overall invention," provide strong evidence as to the scope of the claims. Wireless Protocol Innovations, Inc. v. TCT Mobile, Inc., 771 F. App'x 1012, 1018 (Fed. Cir. 2019). Here, both the Summary and the Abstract clearly contemplate that the user has a role in determining the "policy" that formats the page.  Contrary to IBM's attempt to characterize the "policy structure" as an "unclaimed concept," it is clear that the paragraph at issue is describing the "mechanism" by which the "method" described in the prior program is carried out; moreover, it states that the mechanism "includes a preprocessing process and a policy structure for reformatting an electronic document page."  Patent '831 at 3:15-23.  Read in context, this suggests that the "policy structure" is a mechanism embodying the proximity policy.  Additionally, and contrary to IBM's argument, the use of permissive language in the

specification appears to contemplate that a user may decline to set a proximity policy, not that the proximity policy may be set by someone or something other than the user.

More problematic for Chewy's construction is the risk that claim 11 be rendered superfluous.  However, as Chewy explained at oral argument, claim 11 can be understood as "add[ing] another step where," after the rendered page is reformatted according to the proximity policy, the user "can then modify the proximity policy to be something different and then run the steps again."  Tr. at 98.  Indeed, this interpretation aligns with the language of the specification, which describes the user as, in the first instance, "defin[ing]" the policy, rather than modifying it.  See Patent '831 at 3:20-23.  Accordingly, the Court agrees with Chewy that a "proximity policy" must be "user-defined."

**b.  Hyperlinks**

Chewy argues that the specification is clear that a key component of the alleged invention is that it "uses a proximity policy to reformat regions of a web page which has cluttered hyperlinks."  Patent '831 at 7:64-65.  As Chewy notes, the specification provides that "[w]eb browser 606 may determine that hyperlinks . . . are cluttered based on several criteria," including "the number of hyperlinks per unit of measure, vertical spacing between hyperlinks and/or horizontal spacing between hyperlinks."  Id. at 7:57-62.

IBM, on the other hand, argues that the a "proximity policy" does not necessarily specify "spacing rules for hyperlinks," that is, IBM disputes that the rules need to be for spacing and that they must be for hyperlinks.  In support of its position, IBM points to claim 3, which, IBM argues, covers many different types of proximity policies, only some of which involve spacing of links. See Patent '831, Claim 3 ("the proximity policy includes at least one of a number of links, a spacing of links within the plurality of links, a font setting for the plurality of links, and a number of links per unit area" (emphasis added)).  IBM also points to claim 13, which it argues demonstrates that the proximity policies can be about other types of links beyond hyperlinks.  See id., Claim 13 ("reformatting the rendered page and set of links using the proximity policy to form a reformatted page on the virtual display includes at least one of a hypertext markup language (HTML) tag and a cascading style sheet").

However, as Chewy argues in response, claims 3 and 13 are dependent claims which add additional requirements to the proximity policy as set out in claims 1 and 12, respectively.  And one part of claims 1 and claims 12 is that "the proximity policy defines a minimal spacing between links of a plurality of links within the page." See id., Claim 1 & Claim 2.  This point clearly shows that the proximity policy must address spacing for links.  Moreover, in no part of the specification is there any suggestion

that the "links" referenced in the claim could be anything other than hyperlinks.  Indeed, the specification introduces the term "links" as a concept specific to Hypertext Markup Language (HTML), making clear that the references to "links" are to hyperlinks. See id. at 1:45-48.  Accordingly, the policy-defined spacing rules must be limited to "spacing rules for hyperlinks."

For these reasons, the Court adopts Chewy's proposed construction, to wit, **"user-defined policy specifying spacing rules for hyperlinks."**

### MOTION TO AMEND CHEWY'S ANSWER TO COUNTERCLAIMS

The Court also takes this occasion to address Chewy's unopposed motion to amend its answer.  On September 10, 2021, IBM filed a motion to strike the Third, Fourth, and Fifth Affirmative Defenses in Chewy's Answer, ECF No. 63.  See ECF No. 76.  The basis for IBM's motion is that the identified affirmative defenses were stated in conclusory fashion without any supporting factual allegations.  After the parties met and conferred, Chewy elected not to oppose IBM's motion to strike. Instead, it has filed an unopposed motion for leave to amend its affirmative defenses to address IBM's motion to strike and to add a new affirmative defense.  Specifically, Chewy seeks to (1) drop its Third Affirmative Defense; (2) amend its Fourth Affirmative Defense to add factual pleadings; (3) amend its Fifth Affirmative Defense to drop the defense of res judicial

and add factual pleadings; and (4) add a defense of license with respect to Patent '414.

As the Second Circuit has explained, the general rule "has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017).   IBM, the nonmovant, does not oppose the motion and, thus, has made no showing of prejudice or bad faith.   Accordingly, the Court grants Chewy's motion for leave to amend and denies IBM's motion to strike as moot.

### CONCLUSION

For the foregoing reasons, the Court adopts the claim constructions stated above and grants Chewy's motion for leave to amend its answer (which also moots IBM's motion to strike).   The Clerk of the Court is direct to close docket numbers 76 and 82.

SO ORDERED.

Dated:    New York, NY
          November 9, 2021

                              JED S. RAKOFF, U.S.D.J.

64